In the Matter of C.R.S., Born 7/27/95, Dependent Juvenile, K.A., Mother, B.S. & N.S., Paternal Grandparents.

Appeal of A.S., Father.

In the Matter of C.R.S., born 7/27/95, Dependent Juvenile, A.S., Father, B.S. & N.S., Paternal Grandparents.

Appeal of K.A., Mother.

Nos. 00409 HSBG 1996, 00410 HSBG 1996.

Superior Court of Pennsylvania.

Argued March 5, 1997.

Filed June 23, 1997.

Lindsay D. Baird, Carlisle, for C.R.S.

Ruby D. Weeks, Carlisle, for Cumberland County CYS, participating party.

Before CIRILLO, President Judge Emeritus, and POPOVICH and HESTER, JJ.

POPOVICH, Judge:

This is an appeal by parents, K.A. and A.S., from the order of April 17, 1996, adjudicating the child, C.R.S., a dependent child and issuing a finding of abuse naming either or both parents as perpetrators of such abuse. Herein, the parents contend (1) that there was no clear and convincing evidence presented to support a finding of abuse, (2) that there was no clear and convincing evidence presented to support a finding of dependency, and (3) that Cumberland County Children and Youth Services (CYS) failed to comply with the procedural requirements of the Child Protective Services Law, 11 P.S. § 2201 *et seq.*, and the Juvenile Act, 42 Pa. C.S.A. § 6301 *et seq.* We reverse.[1]

C.R.S. was born on July 27, 1995. Shortly after birth, because there was a history of sudden infant death syndrome in C.R.S.'s extended family, C.R.S. was placed on an apnea (breathing) and bradycardia (heart rate) monitor which warned the parents of interruptions in the child's breathing or decreases in the child's heart rate.[2] The monitor revealed that C.R.S. had numerous episodes of apnea.[3] Specifically, during the month of September, 1995, C.R.S.'s monitor recorded six episodes of apnea. N.T. 2/21/96 pp. 36–37. On October 3, 1995, C.R.S. was examined by Maryellen Gusic, M.D. During the examination, C.R.S.'s father reported that C.R.S. suffered a severe apnea episode on September 29, 1995.

Katherine C. Pearson, Carlisle, for A.S.

John W. Weigel, III, Carlisle, for K.A.

---

1. Although appellants have filed separate appeals, their claims are virtually identical, and, therefore, they will be discussed simultaneously.

2. When C.R.S.'s breathing stopped for more than twenty seconds or his heart rate went below seventy beats per minute, the machine's alarm would beep, thereby alerting the parents that C.R.S. was having "an episode." N.T. 2/21/96 pp. 14, 18.

3. Maryellen Gusic, M.D., testified that the monitor had a memory unit which recorded C.R.S.'s episodes of apnea. The monitor's recordings were later interpreted by neonatologists at the Harrisburg Hospital, who concluded that C.R.S. had episodes of apnea. N.T. 2/21/96 p. 14.

On October 7, 1995, C.R.S.'s monitor beeped, warning the parents that he was having another apnea attack. Father tickled the child's feet in an attempt to revive him. When this method did not work, and the child "turned dusky," Father shook the child. Father was still unable to revive C.R.S., and, therefore, he dialed 911 requesting assistance. Emergency Medical Technicians (EMTs) responded to Father's 911 call. Upon arrival, they found the child in respiratory arrest with no pulse. EMT Christopher Leonard immediately performed cardiopulmonary resuscitation on C.R.S., which included chest compressions and ventilation with a bag-valve mask.[4] Mr. Leonard's efforts were successful, and C.R.S. was transported to Holy Spirit Hospital. The child was subsequently transported to Poly Clinic Hospital's Emergency Room. Physicians who examined C.R.S. noticed a bruise on the child's left eyelid and two bruises under his chin. The physicians suspected that C.R.S. had been abused, and, therefore, they decided to transfer him to the Hershey Medical Center's Emergency Room. Upon arrival, C.R.S. was examined extensively by physicians. The physicians discovered bruises on C.R.S.'s eyelid, chin and nose, and a healing scab on the crown of his head. They also discovered intercranial hemorrhaging and approximately thirty retinal hemorrhages in the child's right eye.

On October 8, 1995, physicians at the Hershey Medical Center referred the case to CYS. CYS contacted Father and informed him that they suspected that C.R.S. had been abused. On October 13, 1995, the child was discharged from the hospital and placed in his parents' custody. CYS told the parents that pending further investigation the child should not be left alone with either parent. On November 15, 1995, CYS informed Father that their investigation was not completed but that C.R.S. should stay with a relative until further notice. The child's paternal grandparents agreed to care for C.R.S. until the matter was settled.

On December 11, 1995, CYS informed Father that the investigation was complete and that abuse was "indicated." C.R.S. continued to live with his grandparents. CYS made no efforts to reunify the family. Following an altercation between C.R.S.'s parents and grandparents, Father requested CYS to return the child to his custody. CYS refused and filed a petition on December 19, 1995, alleging that the child was dependent and abused. An emergency shelter hearing was held on December 22, 1995. Following the hearing, the trial court determined that C.R.S. was abused and that he was a "dependent child" as defined in Section 6302 of the Juvenile Act. A full adjudicatory hearing was held on February 21, 1996. On April 12, 1996, the lower court entered an order finding that C.R.S. was abused by one or both of his parents, finding that he was a dependent child and awarding care and custody of the child to the child's paternal grandparents. A dispositional hearing was held on April 17, 1996. By order entered April 17, 1996, the lower court reiterated its finding that C.R.S. was an abused and dependent child but returned care and custody of the child to his parents, subject to CYS's protective supervision. *See* 42 Pa.C.S.A. § 6351(a)(1) (if a child is found to be a dependent child, the court is permitted to allow the child to remain with his parents subject to limitations and supervision). This timely appeal by C.R.S.'s parents followed.

"Dependency proceedings concern themselves with the correction of situations in which children are lacking proper parental care or control." *In Interest of J.M.*, 438 Pa.Super. 409, 652 A.2d 877, 880 (1995) (citations omitted). A dependent child is one who "is without proper parental care or control ... necessary for his physical, mental, or emotional health...." 42 Pa.C.S.A. § 6302. "Whether a child is lacking proper parental care and control encompasses two discrete questions: (1) Is the child at this moment without proper parental care or control? and (2) If so, is such care and control immediately available?" *In Re Jeffrey S.*, 427 Pa.Super. 79, 628 A.2d 439, 440 (1993) (citations omitted). *See In Interest of JOV*, 454 Pa.Super. 630, 686 A.2d 421 (1996). "The burden of

---

4. A bag-valve mask is a resuscitative device which is placed over the patient's nose and mouth and is then manipulated to force air into the patient's lungs.

proof in a dependency proceeding is on the petitioner ... who must show [that] the juvenile is without proper parental care, and that such care is not available immediately." *In Interest of J.M.*, 652 A.2d at 880 (citations omitted). "Both of these determinations must be supported by clear and convincing evidence." *In Interest of JOV*, 686 A.2d at 423 (citation omitted). Such a conclusion requires that testimony be "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In Re S.M.*, 418 Pa.Super. 359, 614 A.2d 312, 313 (1992) (citation omitted).

■■■ A finding of abuse may support an adjudication of dependency. *In the Matter of Read,* —— Pa.Super. ——, 693 A.2d 607 (1997); *In Interest of J.M., supra; In Interest of J.R.W.,* 428 Pa.Super. 597, 631 A.2d 1019 (1993). When the court's adjudication of dependency is premised upon physical abuse, its finding of abuse must be supported by clear and convincing evidence. *In the Matter of Read, supra; In Interest of J.R.W., supra.* However, "its findings as to the identity of the abusers need only be established by prima facie evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers (parents)." *In Interest of J.R.W.,* 631 A.2d at 1024.

■ Our standard of review in dependency cases is well-established.

> The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re R.R.*, 455 Pa.Super. 1, 686 A.2d 1316, 1317 (1996) (citations omitted).

■ Appellants' first contention is that the trial court's finding of physical abuse was not supported by clear and convincing evidence. Appellants do not dispute that C.R.S. suffered severe injury on October 7, 1995. Rather, they argue that C.R.S.'s injuries were accidental and that they were sustained when Father and the EMT resuscitated the child. CYS argues that the trial court properly concluded that C.R.S.'s injuries were non-accidental and caused by one or both of his parents. Specifically, CYS contends that C.R.S. was injured as a result of "shaken baby syndrome."

In determining whether C.R.S. was abused, the trial court properly defined "child abuse" as "any act or failure to act by a perpetrator which causes non-accidental serious physical injury to a child under 18 years of age." *See* 23 Pa.C.S.A. § 6303(b)(1)(i).[5] Applying this definition to the facts of this case, the trial court concluded that the child's injuries were non-accidental, and, therefore, the product of child abuse. In arriving at this conclusion, the trial court considered the extensive medical testimony which was presented. The trial court's opinion was based largely on its finding "that Dr. Robert Vannucci's testimony indicating non-accidental injury was the most credible ... [and that] Dr. Steven Wassner's testimony that the bruises on the child's chin and head existed prior to October 7, 1995, was credible." Trial Court Opinion filed 7/23/96 pp. 23–25. Finally, the trial court found incredible the parents' testimony explaining the source of C.R.S.'s various injuries. Trial Court Opinion filed 7/23/96 p. 25. The trial court characterized the parents' testimony as conflicting. Our review of the record reveals that the trial court's finding that C.R.S. was abused was not supported by clear and convincing evidence.

Contrary to the trial court's assertion, Dr. Vannucci never stated that he believed that C.R.S.'s injuries were non-accidental, and, therefore, the product of child abuse. Dr. Vannucci testified that C.R.S. suffered trauma. However, Dr. Vannucci never testified that the trauma did not occur while the child

---

5. The definition of child abuse in the Child Protective Act has been incorporated into the Juvenile Act's definition of dependent child. 42 Pa. C.S.A. § 6302.

was being resuscitated. On the contrary, Dr. Vannucci testified that the trauma could have happened during vigorous resuscitation efforts by EMTs. N.T. 2/26/96 p. 86. He stated that the intercranial hemorrhaging and retinal hemorrhages sustained by the child could have happened when Father and the EMT resuscitated him. N.T. 2/21/96 p. 43. He opined that if the child suffered a full-blown cardiopulmonary arrest, as C.R.S. apparently did, extremely vigorous resuscitation could cause his injuries. N.T. 2/21/96 p. 43. This is especially true if the child received chest compressions of a major degree, as was the case here. N.T. 2/21/96 p. 51. He also stated that the hemorrhages could have happened if the child was shaken. He stated that the "shaking could be accidental in the setting of the history of this case." N.T. 2/21/96 p. 35. He specifically stated that he did not have an opinion as to whether the shaking of C.R.S. was accidental or non-accidental in nature. N.T. 2/21/96 pp. 50–51. Based on the aforementioned, we find that the trial court's conclusion that Dr. Vannucci testified that the child's injuries were non-accidental is not supported by competent evidence. In fact, the only evidence of record supporting the trial court's inference was Dr. Vannucci's statement that "retinal hemorrhaging and injury to the brain is consistent with a diagnosis of shaken baby syndrome." N.T. 2/21/96 p. 49. Based on our independent review of the record, we cannot agree with the trial court's inference that this testimony established that C.R.S. was abused. *See In Re Custody of Frank*, 283 Pa.Super. 229, 423 A.2d 1229 (1980) (appellate court is not bound by the deductions or inferences made by the lower court).

We also do not agree with the trial court's inference that Dr. Wassner's testimony established that C.R.S. was abused. The trial court correctly noted that Dr. Wassner

opined that the bruises on C.R.S.'s chin and the scab on the back of his head were not new, and, therefore, in his opinion, they were not received by C.R.S. on October 7, 1995, while he was being resuscitated. As to the source of these injuries, Dr. Wassner conceded that the scab on the back of the child's head could have resulted in an accidental manner as was alleged by Father. Specifically, he conceded that Father could have scratched the back of C.R.S.'s head accidentally with his ring. N.T. 2/21/96 p. 47. He also conceded that the small bruise on the child's nose appeared to be new and that it could have resulted from the resuscitation procedure. N.T. 2/21/96 p. 47. He was unable to state an opinion as to the origin of the bruises on C.R.S.'s chin. Accordingly, we cannot find that Dr. Wassner's testimony established by clear and convincing evidence that C.R.S.'s injuries were non-accidental.[6]

We also disagree with the trial court's characterization of the parents' testimony as conflicting. The parents have consistently maintained, and so informed physicians, that the scab on C.R.S.'s head resulted from Father's ring scratching the child's scalp, and that the other injuries resulted when the the child was resuscitated on October 7, 1995. Father admitted to physicians that he shook the child. The only dispute among physicians and CYS caseworkers was the amount of force Father reported he used when shaking the child. While we acknowledge that the assessment of credibility of witnesses is within the sound discretion of the trial court, we cannot agree with the trial court's conclusion that the parents offered conflicting evidence as to the source of C.R.S.'s injuries. *Kembel v. Schlegel*, 329 Pa.Super. 159, 478 A.2d 11 (1984). Since this finding is not supported by the record, we are not bound by it. In re *Custody of Frank, supra.*

---

6. We note that Dr. Wassner testified that the intercranial hemorrhaging observed in C.R.S. consisted of "old blood" and that the retinal hemorrhages were more recent. Therefore, he concluded that the injuries to C.R.S.'s head and eyes were sustained on separate occasions. During cross-examination, Dr. Wassner admitted that he formed this opinion based on information provided to him by a radiologist. Appellants' attorney successfully showed that the information relied on by Dr. Wassner was incorrect. The attorney demonstrated that the radiologist concluded that both hemorrhages were recent. With regard to this issue, the trial court stated the following: "[Appellants' attorney] successfully impeached Dr. Wassner on this point. Dr. Wassner's statements with regard to 'old blood' were not a part of our determination on the issue of dependency." Trial Court Opinion filed 7/23/96 p. 23.

As for the remaining expert medical testimony, Glen Bartlett, M.D., a pediatrician, specifically opined that C.R.S.'s injuries were accidental and that they were caused during the resuscitation process. N.T. 2/26/96 p. 39. Christopher Stuart Ryder, M.D., a pediatrician, testified that he was not an expert in diagnosing intercranial and retinal hemorrhages but that he had seen many cases of "shaken baby syndrome." Based on published articles which he had read, he believed that it was unlikely that C.R.S.'s hemorrhages resulted from cardiopulmonary resuscitation. Dr. Ryder admitted that the hemorrhages could have resulted if Father shook the child vigorously to resuscitate him. N.T. 2/26/96 p. 79.[7] Maryellen Gusic, M.D., testified that she was C.R.S.'s pediatrician and that she examined him on October 3, 1995. She also testified that during the examination she observed no bruises and that she never observed symptoms of abuse. N.T. 2/21/96 p. 41. James W. McManaway, III, M.D., a pediatric ophthalmologist, stated that "to a reasonable degree of medical certainty, the child's retinal hemorrhages were caused by a non-accidental injury." N.T. 2/21/96 p. 8. However, as the trial court noted in its opinion:

> Dr. McManaway formed his opinion without the benefit of the EMT record which clearly stated that chest compressions had been performed on the child. In fact, [the doctor] initially discounted chest compressions as a possible cause of the child's injuries because he believed that no compressions were performed. The whole record clearly shows that Dr. McManaway's opinion was premature and based on an incomplete history. When Dr. McManaway learned that chest compressions had been performed by EMT's, he acknowledged that chest compressions could be an explanation for the child's retinal hemorrhages.

Trial Court Opinion filed 7/23/96 p. 21. Accordingly, the trial court did not consider Dr. McManaway's testimony to be reliable.

A thorough review of the testimony indicates that there was no clear and convincing evidence that C.R.S. was abused or that his injuries were non-accidental. In fact, the medical testimony and the testimony from CYS suggested that the injuries were accidental and were inflicted when the child was being resuscitated. "Innuendo and suspicion alone are not enough to compel a finding of child abuse." *In Interest of J.M.*, 438 Pa.Super. 409, 652 A.2d 877, 881 (1995).

We further find that there was no clear and convincing evidence that C.R.S. was a dependent child. The trial court found C.R.S. to be a dependent child because the court believed that the child had been abused. At the dispositional hearing, the trial court concluded that although C.R.S. had been abused in the past, the court believed that sufficient progress had been made in the case so that the child could be returned to the parents. C.R.S. was then returned to the care and custody of his parents, subject to conditions.[8]

As previously mentioned, "a child will be declared dependent when he is presently without proper parental care and when such care is not available immediately." *In Interest of R.T.*, 405 Pa.Super. 156, 592 A.2d 55, 57 (1991). Proper parental care is defined as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In Interest of Justin S.*, 375 Pa.Super. 88, 543 A.2d 1192, 1200 (1988) (citation omitted).

7. In rendering his opinions, Dr. Ryder referred to articles which he had read in the *Journal of Pediatrics*. In Pennsylvania, expert witnesses may refer to published works on matter which is the subject of their testimony, but such authorities may not be received into evidence. *Ruzzi v. Butler Petroleum Co.*, 527 Pa. 1, 588 A.2d 1 (1991); *Mazur v. Merck & Co.*, 742 F.Supp. 239 (E.D.Pa.1990) (expert witness could turn to medical literature in the relevant field as the basis for reaching an opinion). At the hearing, the lower court allowed Dr. Ryder to refer to articles he had read in the *Journal of Pediatrics*, but indicated that he was giving them "less weight." This was proper. *Ruzzi, supra.*

8. Since C.R.S. was returned to the custody of his parents, the issue of removal is not at issue in this case.

At the dispositional hearing, it was revealed that CYS referred C.R.S.'s parents to an area parenting program and requested that they attend six meetings. N.T. 4/17/96 pp. 22–24. Lynn Lyons, the coordinator of the parenting program, testified that at least one parent and C.R.S. attended all six meetings, C.R.S.'s Mother attended four meetings and Father attended five meetings.[9] Ms. Lyons stated that after observing the parents she had no concerns as to the manner in which they cared for C.R.S. N.T. 4/17/96 p. 25. She specifically indicated that the parents attended classes concerning child abuse, child development, infant care and communicating with a child. N.T. 4/17/96 pp. 33, 35. She found that during the discussion classes Father offered appropriate ideas regarding children, he interacted very well with C.R.S. during "play time" and it was not necessary for Father to attend anymore "play time" sessions. N.T. 4/17/96 p. 34. She recommended that Mother attend a few more "play time" sessions. This recommendation was not based on any concerns which Ms. Lyons had regarding Mother's abilities to care for C.R.S. Rather, the recommendation was based on the fact that each time Mother was observed during "play time," she was caring for her four-year-old son and C.R.S. Therefore, Ms. Lyons suggested that Mother should have more time to interact solely with C.R.S., without the interference of her other child.

The record does not clearly and convincingly establish that proper parental care or control was not available immediately for C.R.S. The evidence addressing the appellants' present abilities and shortcomings indicates that they are able to provide the proper parental care needed by C.R.S. While we acknowledge that C.R.S. suffered trauma in the past related to his medical condition, there has been no evidence that the parents are incapable of rendering proper care in the future. Simply put, CYS failed to show by clear and convincing evidence that the par-

ents are incapable of rendering proper parental care immediately. Accordingly, we reverse the trial court's finding of dependency. For all of the foregoing reasons, we reverse the trial court's finding of abuse and dependency.[10]

Reversed.

---

9. Each parenting meeting lasted for two and one-half hours. During the first hour, the parents and C.R.S. interacted in a nursery school setting. During the second hour, the parents attended a discussion group where they were provided with information on child care.

10. In light of our foregoing discussion, we need not discuss appellants' final contention.