J-S01028-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: E.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: BRIAN FORSYTH, GUARDIAN AD LITEM | |
| Appellant | No. 1585 MDA 2016 |

Appeal from the Order entered August 24, 2016,
in the Court of Common Pleas of Berks County,
Juvenile Division, at No(s): CP-06-DP-0000255-2016.

BEFORE: GANTMAN, P.J., DUBOW and MUSMANNO, JJ.

MEMORANDUM BY DUBOW, J.:                    **FILED FEBRUARY 14, 2017**

Brian Forsyth, the court-appointed Guardian Ad Litem ("GAL"), appeals from the trial court's order dismissing a Dependency Petition filed by the Berks County Children and Youth Services ("the Agency"). After careful review of the record and relevant law, we reverse and remand for further proceedings.

The relevant factual and procedural history of this case is as follows. E.M. ("Child") was born in November 2014 to Mother and Father. Mother works full time at New Directions Treatment Services in West Reading, and

Father cares for the Child while she is at work.  In May 2016, Mother and Father temporarily separated and Father moved into his father's home.[1]

On May 16, 2016, when Mother went to Father's temporary home to retrieve the Child, Father refused to hand the Child to Mother.  Mother then pushed Father and punched him in the stomach while Father held the Child. Still holding the Child, Father then punched Mother in the face.  Father called the Reading Police Department.  The police arrived, separated the parties, and instructed Mother to leave.  Mother left, but returned later and retrieved the Child from Father's neighbor where Father had temporarily left the Child. Soon thereafter, Mother filed a Petition for a Protection from Abuse ("PFA") Order.

Over the next few weeks, Father and Mother continued to have disputes which resulted in Father calling the police "four or five times" when Mother came over to his father's house to "keep the peace" so "nothing bad would happen."  N.T., 8/24/16 at 5-6, 36.  After a hearing on the PFA, the court ordered Mother to take the Child to Father's house while she worked.[2] Father and Mother then reconciled, and Mother withdrew the PFA petition on May 31, 2016.  *See* N.T., at 58.

---

[1] Father was briefly incarcerated for a probation violation when he failed to pay restitution as ordered in connection with his kicking in his ex-wife's door.

[2] The record does not indicate whether the court granted, denied, or held the PFA in abeyance.

The Agency received a report of this domestic dispute in May and attempted to work with the family. The Agency went to the home but Father said he would not cooperate and did not want to have anything to do with the Agency. N.T. at 39. The Agency continued to try to work with the family. In June, Mother went to the Agency to tell them that the PFA had been dropped and there were no more concerns. The Agency informed Mother that she needed to allow them in the home to make sure that there were no concerns. The Agency subsequently visited, saw the Child sleeping in his crib, and left after briefly speaking with Father. Father informed the Agency that neither he nor Mother would cooperate with the Agency.

On July 22, 2016, the Agency filed a Dependency Petition alleging that the Child was without proper care or control, was in Mother's home, and was "in imminent risk of placement in foster care absent preventive services." Dependency Petition, 7/22/16.

The juvenile court held a hearing on August 24, 2016. At the hearing, Mother and Father proceeded *pro se* after declining the assistance of counsel and refusing to sign a waiver of counsel form. Father testified that the parties had not argued about who should take care of the Child, but he acknowledged that Mother felt as if he were taking the Child from her "like a mother should." N.T. at 21. He stated that the Child was "nearby" when they argued, but that he did not feel the two of them would benefit from domestic violence counseling. The following exchange occurred between Father and the GAL:

- 3 -

**Father**:  Everybody has disputes.  This just this [sic] particular one I think was a little bit blown out of proportion on both of our parts.  But it was a mistake.  And I don't think one mistake should justify a whole journey of what we already done for this young boy or what we have done with our relationship. I don't think one argument – we learned from this man, and this is something that we all can learn from.

**GAL**:  But if you called the police five times, these are pretty serious arguments; correct?

**Father**:  It was stupidity, sir.  It was stupidity.  I wasn't in my right mind; neither was she.  It was all about who wanted what they wanted and who can use what and who can use who quicker.  And that's what we did.  We used you all then you all turned around and flipped it back on us.  That's what you doing.

**GAL**:  But if some kind of domestic violence counseling can help the two of you not argue and provide a safer –

**Father**:  I just told you where we are getting our counseling from.  We are getting our counseling from the Bible.  And that's going to be bigger than any type of counseling you can give me or anybody else can give me.  So I don't agree.

. . .

And now we see how our behavior was, how that made our son look, how it made us look.  It made us look very foolish, sir.  It made us look like we are incapable for not taking care of that little guy because of how our behavior was at that time.

*Id*. at 22-3.

Father also testified: "Is [the Child] going to see us act up along the way?  Sure, we are not perfect people.  We make mistakes." *Id*. at 51.  Father continued:

I mean as far as putting the hands on each other, that was just in the moment of it.

It wasn't like I drew back and punched my wife in the fact.  Look how big my hand is and look how little her face is.  If I would

have punched her in the fact, she would have had a mark, an identifying mark that I would have got arrested for. So she felt like she got punched because in the heat of the moment she – we are moving. We are -- maybe she – I don't know. I told her I don't remember doing it, and I have to be honest about that. I don't remember hitting her. But she's saying that she got hit. Okay. Well, where is your mark at. I know you did it. Okay.

*Id*. at 51-2.

Mother testified regarding the May 16th incident, as follows:

**Mother**: [On May 16,] I went to pick up my son, [Father] would not give me my son. That's when I punched him in the stomach. And then he just punched me in my face but just to get me away from him.

And the cause of cops [sic] were called and they told me to leave. And the only way I can get my son if I would come to here to do a PFA. And they can do what they have to do.

So when I left, a family member stayed back and saw that [Father] left the baby with the neighbor. So when [Father] left, I drove back and I went to the neighbor and I took my son.

. . .

[**Agency**]: And how often has Mr. Moran called the police on you?

**Mother**: Well, after this dispute, it was around four or five times that he called it. But before and after no.

*Id*. at 34.

Mother further stated that she was not afraid of Father and she has no concerns about him watching their son. *See* N.T. 35-6. She also stated that she and Father do not need domestic violence counseling, and she is not aware that there are any domestic violence concerns. *Id*. at 38, 60.

The Agency caseworker testified that when they went to Father's house after receiving the report of domestic abuse, Father was uncooperative. *Id*. at 40. She stated that the parties complained that the other parent had mental health issues and was unstable, but that Mother never indicated she had any concern regarding the Child being in Father's care. The caseworker noted that the Agency recommended domestic violence evaluation, services, and mental health evaluation. *Id*. at 41. During cross-examination by Mother, the caseworker stated that the reason for the visit from the Agency was to talk to Mother about the effect of domestic violence on the Child. On cross-examination by the GAL, the caseworker testified that upon subsequent attempts to visit the parents' home, Mother and Father told the Agency that "they would not be cooperating, that they did not need services, that they would not be taking part, and [the Agency] did not need to return to their home." *Id*. at 45.

At the end of the hearing, the court told Father that it wanted the Agency to facilitate a family group decision-making ("FGDM") conference "because if you can address these **issues that I see of potential domestic violence continuing** . . . I would just like to make certain that there's a plan. So how do we keep your son safe in the event something happens." *Id*. at 61-2 (emphasis added). The court continued to emphasize the importance of the FGDM conference with the Agency facilitating, but Father stated he refused to accept the court's "offer." *Id*. at 63.

The court then provided the following determination on the record:

So based on the evidence that was presented today, I am not finding dependency. I haven't heard anything about the safety, direct safety of your son. I have watched him during the hearing today. I watched you handle him. I can see he is appropriate. He seems clean. I haven't heard any deficiencies in his care. **But this piece about domestic violence is a concern to me. While it doesn't appear to be a concern today, I am not convinced that you really have a plan.** Because I would like to hear what the plan is. And if it's your church that's addressing it, I would like to hear from a [FGDM] conference. So just know the Agency is going to continue to do their job. And so they may continue to contact you to make sure that your son is safe.

*Id*. at 63-4 (emphasis added).

Father responded "[t]hat's fine" but then told the court that he was "not going to cooperate with an Agency that I feel is fraudulent." *Id*. at 65.

The court then informed Father that the Agency's job

is to ensure the safety of your son. I haven't heard any testimony today, direct testimony, that your son has been harmed in any way. **Although I will tell you that there is evidence that just having domestic violence take place in the home where the child is present is indirect harm to the child.** So you have to understand that. So you need to get that piece under control.

If your church is addressing that and there is nothing further happening vis-à-vis your arguments and the inappropriate activity that is taking place in front of your child, then you are going to be okay with regard to further investigation.

But, sir, you have to make certain that you are addressing this in an appropriate way. I am still talking. I would like the Agency to explore [FGDM] conference with you so that I could see that report and be comfortable that this is going to be a long-term solution to your problem and it wasn't [sic] just a single episode.

Your wife's employment of ten years was important to me in terms of her mental health issues. She's been employed by the same company for ten years. It's in the mental health field.

> So I believe that you had an episode between the two of you that got out of control. It may be, sir, that you have or could use some anger management generally in your life. But in this case, the PFA was withdrawn. And I am dismissing the petition.

*Id*. at 66 (emphasis added).

The court then dismissed the Petition on August 24, 2016. The next day, the Agency closed the case.

The GAL timely appealed. Both the GAL and the trial court have complied with Pa.R.A.P. 1925.

The GAL raises the following issues:

> 1. Should the [Child] have been found dependent as a matter of law and fact where it was shown that he was endangered by being placed between physically violent parents in an ongoing domestic violence environment?
>
> 2. Whether the trial court order should be overturned as a matter of law where the trial court did not follow [] Pa.R.J.C.P. 1408 by specifying after hearing the evidence and before making the Court's dependency determination which allegations in the petition were or were not proven by clear and convincing evidence.

GAL's Brief at 2.

Our Supreme Court has recently reiterated the applicable standard of review:

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion[.]

*Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citation and quotation marks omitted). Once a party files a dependency petition, the court proceeds in a two-stage process. *In re M.B.,* 101 A.3d 124, 127 (Pa. Super. 2014).

> The first stage requires the juvenile court to hear evidence on the dependency petition and determine whether the child is dependent pursuant to the standards set forth in section 6302.[3] 42 Pa.C.S. § 6341(a). If the court finds clear and convincing evidence that the child is dependent, it may move to the second stage, in which it must make an appropriate disposition based upon an inquiry into the best interests of the child. 42 Pa.C.S. § 6351(a); *In re B.S.*, 923 A.2d 517, 521 (Pa. Super. 2007).

*Id.*

> A dependent child is defined as one who, *inter alia*:

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control **may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[**.]

42 Pa.C.S. § 6302 (emphasis added).

This Court has observed that clear and convincing evidence is evidence that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the

---

[3] 42 Pa.C.S. § 6302 provides definitions applicable to the Juvenile Act.

precise facts in issue." ***In the Matter of C.R.S.***, 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted).

In his first issue, the GAL asserts that the Child "in this case was unsafe without Court and Agency oversight, and needed to be found dependent to ensure his safety." GAL's Brief at 8. He avers that the trial court erred in stating that it had not "heard anything about safety, direct safety of" the Child. ***Id***. at 9. We agree.

As set forth above, the court heard testimony from four different people, including Mother and Father, that at least one incident of domestic violence occurred in the presence of the Child. Although at one point Father denied that he had hit Mother, Father later acknowledged that he and Mother had "laid hands" on one another. Father never denied that Mother had hit him. He noted that Mother had previously gone through some mental health treatment, and acknowledged that he needed police presence at least four other times "to keep the peace" between Mother and him. Mother admitted that she had hit Father and testified that Father had hit her. The trial court, thus, heard clear evidence that domestic violence had occurred in the presence of the Child.

The trial court repeatedly stated that it was concerned about these parents getting support to help them deal with the issue of domestic violence. The court stated several times that it had concerns about the possibility of the recurrence of domestic violence, which would put the safety

of the Child at risk. The court explicitly indicated that it believed the Agency needed to be involved to ensure the child's safety and, in fact, stated that the Agency would stay involved.[4] Most significantly, the trial court explicitly acknowledged domestic violence in the home has been shown to harm children. *See* N.T. at 66.[5]

We, thus, conclude that the trial court had clear and convincing evidence "to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue," *i.e.* that domestic violence occurred in the presence of the Child, and on at least one occasion while Father was holding the Child; and that, as a result, the conduct of the parents placed the "health, safety or welfare of the [C]hild at risk." 42 Pa.C.S. § 6302; *Matter of C.R.S.*, *supra* at 843. Accordingly, the court erred as a matter of law when it concluded that the Child was not dependent.

In light of the foregoing, we reverse the Order dismissing the Dependency Petition, and remand for the court to adjudicate the Child dependent pursuant to 42 Pa.C.S. § 6341 and to hold further proceedings in order to make an appropriate disposition based upon a thorough inquiry into

_____

[4] After the court's determination, the Agency closed the case.

[5] Although the trial court referred to exposure to domestic violence as causing "indirect" harm, studies show that domestic violence causes mental and emotional injury that directly harms the behavioral health of children. *See, e.g.,* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2872483.

the best interests of the child pursuant to 42 Pa.C.S. § 6351(a).[6] We note that the trial court, when determining whether to commit the Child to the Agency, should consider, among other factors, the research on the emotional and mental trauma that domestic violence can cause a child exposed to domestic violence, Father's lack of cooperation with the Agency, and the parents' success or lack of success in addressing their domestic violence problems.

Order reversed. Case remanded with instructions. Jurisdiction relinquished.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/14/2017

---

[6] In light of our disposition, we will not address GAL's remaining issue.