J-S21001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : IN THE SUPERIOR COURT OF<br>: PENNSYLVANIA<br>:<br>: |
| APPEAL OF: M.A., FATHER | :<br>:<br>:<br>:<br>:<br>: No. 407 EDA 2021 |

Appeal from the Order Entered February 9, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000723-2020

BEFORE:   BOWES, J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:            **FILED SEPTEMBER 20, 2021**

M.A. ("Father") appeals from the February 9, 2021 order of adjudication and disposition, wherein the juvenile court adjudicated A.B. dependent and entered a finding of child abuse against Father as a perpetrator by omission. We affirm.

A.B. was born to Father and S.G., ("Mother") in April 2019.  The couple resides in separate homes.  Father lives in Darby, Pennsylvania.  Since June 2020, Mother exercised physical custody of A.B. in Philadelphia.  Prior to that date, A.B. lived with his maternal aunt, who also cared for the child's older half-sibling under an informal agreement with Mother.  Father visited A.B. once per week.

---

[*] Retired Senior Judge assigned to the Superior Court.

Prior to the incident that precipitated this appeal, the Philadelphia Department of Human Services ("DHS") had been involved with the family periodically since September 2019, due to Mother's homelessness and mental health problems. DHS either visited Mother or provided services to the family through a community umbrella agency ("CUA") on three occasions. The last contact occurred in January 2020.

On June 12, 2020, at approximately 4:00 a.m., Mother and Father transported then-thirteen-month-old A.B. to Children's Hospital of Philadelphia ("CHOP") with second and third-degree burns covering approximately twenty percent of his body: specifically, his feet, genitalia, buttocks, lower back, and back of his legs. These injuries, which were consistent with forced immersion into scolding liquid or boiling water, were so severe that A.B. was transferred to the children's burn center at St. Christopher's Hospital in Philadelphia ("St. Christopher's"), which ultimately classified the incident as "a near fatality." N.T. 2/9/21 at 55. Norrell Atkinson, M.D., who directs St. Christopher's child protection program, testified at the ensuing adjudication hearing that A.B. was in significant pain that required several doses of morphine to manage. *Id*. at 33. Dr. Atkinson also relayed that the child was subsequently hospitalized in the intensive care unit for over one month and endured "multiple debridements and skin grafts for the burns at that time." *Id*.

Further medical examination by the pediatricians in St. Christopher's child protection program revealed multiple fractures in varying stages of healing, bruises on his chest and face, and two hematoma, *i.e.*, collections of blood, in his liver. Specifically, Dr. Atkinson testified at the adjudication proceeding that a skeletal survey performed on June 12, 2020, revealed a newer fracture to the child's left shoulder and healing fractures to A.B.'s right posterior rib cage and right hand. Dr. Atkinson noted that "healing of fractures starts around 10 to 14 days after the injury is sustained" and that the nature and type of these injuries implied that they were caused by the application of external force. ***Id***. at 27-28, 30, 40. She opined that A.B.'s hand injury preceded his rib injuries, which fell within the ten-to-fourteen-day time frame.

As to the hematomas, which Dr. Atkinson believed were caused by blunt force trauma to the child's abdomen, no precise time frame could be provided. ***Id***. at 30. However, Dr. Atkinson believed the injuries were recently sustained. Specifically, she explained that A.B.'s elevated liver enzymes and "very low blood count" were reflective of a newer injury ***Id***. at 31.

In sum, Dr. Atkinson offered her expert opinion that these injuries were tantamount to child abuse. ***Id***. at 34. She explained, "These are inflicted injuries. This is child physical abuse—severe abuse on . . . more than one occasion." ***Id***. at 34-35; ***see also id***. at 42-43 (opining these types of physical injuries were unlikely to be associated with household fall).

On the same date that Mother and Father brought A.B. to the hospital with the severe burns, DHS initiated a Child Protective Services ("CPS") investigation into the incident. As part of that inquiry, DHS interviewed Mother, who stated that the burns were accidental and occurred when A.B. overturned a bucket of boiling water on himself. Mother later amended her account of the incident to state that A.B. turned on the hot water spigot when she left him unattended in the bathtub. *Id*. at 53. She continued that, after calling Father and waiting for him to arrive at her house, she and Father transported A.B. to the hospital.[1] *Id*. at 54.

DHS spoke to Father on July 13, 2020, the day after he brought his son to the hospital. *Id*. at 62. During that interview, Father stated that he was interested in taking the child home upon his discharge from the hospital, a prospect that DHS rejected based upon its concerns about A.B.'s injuries and his need for specialized care. *Id*. at 63. Father also shared his concern about Mother's discipline of A.B., her deficient parenting skills, and her inability to care for A.B. and his sibling. *Id*. Father informed the investigator that, while A.B. resided with Mother, Father treated an incident of severe diaper rash with soap and water, and that on other two occasions, he discovered A.B. locked

_____

[1] On June 19, 2020, the police charged Mother with aggravated assault. endangering the welfare of children, simple assault, and recklessly endangering another person. While Mother was imprisoned as of the date of the adjudication hearing, it is unclear from the certified record whether she was convicted of any of the above-referenced offenses.

in a closet and a room, respectively, when he arrived at the home for a custody transfer. *Id*. at 64. He also noticed bruising on the child's body and noted that A.B. was a clumsy child. *Id*. Father neglected to inform the police or seek medical care for the child based on any of these incidents. *Id*. at 65-66. Indeed, he left the child in Mother's care notwithstanding his concerns. *Id* at 67.

The agency attempted a follow-up interview with Father but he advised DHS that he did not want to participate in the investigation any further. *Id*. While Father continued to believe that Mother needed help with her parenting skills, he wanted DHS to drop the child abuse investigation. *Id*. Ultimately, the CPS report was "indicated" both as to Mother as the perpetrator of abuse and as to Father for his failure to act. *Id*. at 67-68.

DHS obtained protective custody of A.B. while he was in the hospital and placed him in foster care through Bethany Christian Services. The older sibling remained in the care of the maternal grandmother. Father maintained remote, supervised visits. On July 28, 2020, DHS filed a dependency petition. In September and November 2020, the juvenile court entered orders continuing the adjudication proceedings.

During the ensuing evidentiary hearing on February 9, 2021, DHS presented Dr. Atkinson's expert testimony and the lay testimony of Nikkia Plunkett and Glenda Rivera, the DHS investigators who interviewed Mother and Father, respectively. In addition to the medical testimony, Dr. Atkinson

revealed that she spoke with Father at the hospital and Father expressed concern that Mother may have caused the injuries and noted that Mother previously hit the young child as a form of discipline. N.T., 2/9/21, at 23.

Father testified on his own behalf.[2] As it relates to the claims that he asserts on appeal, Father testified that he previously confronted Mother about the scratches and bruises that he observed on A.B., and, noting the child's clumsiness, he accepted as plausible her explanations that the toddler had been roughhousing with his sibling or accidently tripped. *Id*. at 76. Likewise, Father maintained that he filed for custody of A.B. in November of 2019, but argued that the proceedings were derailed by the COVID-19 pandemic. *Id*. at 75.

In addition, Father recounted the incident wherein he treated a diaper rash that presented after A.B. had been in Mother's care. *Id*. at 97. Father vehemently denied, however, that he discovered A.B. locked in a room during a custody exchange or that he told either Dr. Atkinson or Ms. Rivera that Mother often hit the child. *Id*. at 84-85, 86, 87, 88, 95, 97. Father conceded telling DHS that Mother suffered from mental health problems, that he was concerned about her parenting skills and the manner in which she disciplined the children, and that he observed cuts on the child's hand, which he believed

---

[2] A.B. was represented by a child advocate, who participated in the cross-examination of the witnesses. The child advocate submitted a brief to this Court in support of the juvenile court's finding of abuse and adjudication of dependency.

were self-inflicted. *Id*. at 90, 92. However, he ultimately defended Mother's behavior stating, "she just needs to go to a parenting class . . . that's all[.]" *Id*. at 96. Father then reiterated, "I never indicated that she's hurt anyone [or] noting [sic]" *Id*. at 97.

Ruling from the bench at the close of evidence, the juvenile court adjudicated A.B. dependent and found Father to be a perpetrator of abuse by omission. *Id*. at 100-01. As to the dependency adjudication, the court reasoned that neither parent was ready, willing or able to care for A.B. *Id*. at 100. In relation to Father's role in the child abuse inflicted upon A.B., the court stated,

> [F]ather's story is inherently inconsistent. I know [F]ather wants to deny that he had anything to do with it, and he did not have anything to do with the commission of any child abuse against the child, but he is found to be a perpetrator by omission.
>
> By his own admission, [F]ather had many . . . opportunities to save this child from this horrible abuse, and he did nothing. The evidence is clear and convincing. Father's statements to the contrary are not believable by this Court.

*Id*. at 101. The juvenile court did not find aggravated circumstances against Father and it ordered weekly line-of-sight supervised visitation between Father and A.B. at the agency. *Id*. at 104.

The court-ordered placement goal was "return to parent or guardian." Order of Adjudication and Disposition, 2/9/21, at 2. As to Father's prospects of reunification with A.B., the court observed, "I believe that there's an opportunity to reunify this child with his father, but there will have to be

significant education done for [F]ather so he understands his role in protecting

this child, going forward." N.T., 2/9/21, at 102. This timely appeal followed.

Both Father and the juvenile court complied with Pa.R.A.P. 1925. Father

presents three questions for our review:

1. Did the trial court err by finding that Father was a perpetrator of child abuse in the absence of clear and convincing evidence that he intentionally, knowingly, or recklessly caused or created a likelihood of the child's injuries through a recent act or failure to act?

2. Did the trial court err by adjudicating the child dependent without clear and convincing evidence that Father could not provide proper parental care and control?

3. Did the trial court err by not hearing any evidence relating to Father's ability to care for the child?

Father's brief at 9.

We review the juvenile court's adjudication of dependency and finding

of child abuse for an abuse of discretion. As stated by our Supreme Court,

the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.

*In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (quotations and citation omitted).

As this case involves a finding of abuse in the context of an adjudication

of dependency governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375, we

start by reiterating the interrelation of the Juvenile Act and the Child Protective

Services Law ("CPSL"). As stated by the High Court in *In re L.Z.*,

As part of the dependency adjudication, a court may find a parent to be the perpetrator of child abuse[.]  If the court finds the parent to have perpetrated abuse, the relevant CYS agency would file with the Department of Public Welfare a "founded report" as defined by Section 6303(a) of the CPSL, which would trigger inclusion on the statewide ChildLine Registry, which is also governed by the CPSL, specifically 23 Pa.C.S. § 6331.

*In re L.Z.*, supra at 1176–77 (footnotes omitted).

Furthermore, pursuant to the doctrine of incorporation, the Juvenile Act's definition of dependent child subsumed the definition of child abuse outlined in the CPSL and the statutes "must be applied together in the resolution of child abuse complaints.". *In the Interest of J.R.W.*, 631 A.2d 1019, 1024 (Pa.Super. 1993).  We explained:

The Legislature intended a detailed and specific definition of abuse to leave no doubt as to the capacity of the trial court, which in this case can only be the Juvenile Court, to make a finding and determination that a child has been abused. In its capacity as a trial judge, the Juvenile Court judge will look and must look to the above definition of child abuse in a case referred by the child protective service agency to the Court under petition for review of dependency when child abuse has been alleged.

*Id*.

The CPSL defines child abuse, in pertinent part, as "intentionally, knowingly or recklessly . . . [c]ausing bodily injury to a child through any recent act or failure to act . . .[or] [c]reating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.  23 Pa.C.S. § 6303(b.1), (1) and (5).  Critically, a "recent act or failure to act" is defined as "[a]ny act or failure to act committed within two years of the date of the report to the department or county agency."  23 Pa.C.S. § 6303(a).  The CPSL

further defines bodily injury as "[i]mpairment of physical condition or substantial pain." *Id*.

As to the necessary mental state, the CPSL adopts the definitions of intentionally, knowingly, and recklessly as outlined in our Crimes Code, 18 Pa.C.S. § 302. *See* 23 Pa.C.S. § 6303(a). Since Father's argument challenges the juvenile court's finding of his reckless failure to protect A.B., we outline the pertinent definition as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3).

At the outset, we note that Father's third claim, relating to the juvenile court's purported failure to allow "any evidence relating to father's ability to care for the child," is waived because he failed to preserve the issue in the juvenile court. Father's brief at 27. Pursuant to Pa.R.A.P. 302, "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Instantly, Father neglected to cite to the place in the record where he objected to the juvenile court's purported refusal to allow this evidence. Indeed, the certified record bears out that Father never sought to present any

testimony regarding his ability to care for A.B. Thus, that claimed is waived.

**See** Pa.R.A.P. 302(a).[3]

Next, we address Father's argument that the juvenile court erred in finding that Father was a perpetrator of child abuse by omission. As Father correctly observes, the juvenile court must find child abuse by clear and convincing evidence. **In re L.V.**, 209 A.3d 399, 417 (Pa. Super. 2019). That standard of proof requires,

> that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

**In the Interest of J.M.**, 166 A.3d 408, 423 (Pa. Super. 2017).

Instantly, Father contends that DHS did not present clear and convincing evidence that he recklessly created a likelihood of injury through a failure to act. **See** Father's brief at 20-25.

As we recently restated with regard to recklessness:

> Recklessness implicates knowledge in two ways: (1) the actor must consciously (*i.e.*, with knowledge) disregard a substantial

_____

[3] Moreover, Father's two-paragraph argument in support of this assertion of juvenile court error is woefully underdeveloped and lacks citation to any pertinent legal authority beyond the applicable burden of proof in dependency proceedings. Accordingly, the issue also is waived for this reason. **See** Pa.R.A.P. 2119(b) and **Thomas v. Thomas**, 194 A.3d 220, 229 (Pa.Super. 2018) (failure to support each issue with discussion and analysis of pertinent authority hampers review and risks waiver).

and unjustifiable risk; and (2) the risk that the actor disregards is measured by the circumstances known to the actor. Conscious disregard of a risk, in turn, involves first becoming aware of the risk and then choosing to proceed in spite of the risk.

***Commonwealth v. Sanders***, 2021 WL 3616039, 2021 PA Super 163 (Pa.Super. filed Aug. 16, 2021) (*en banc*) (quotations and internal citations omitted).

Our sister court succinctly phrased the applicable standard for determining whether a parent or caregiver is a perpetrator of abuse by omission under the CPSL as follows:

We think the appropriate standard to use to determine whether a parent or caretaker is a perpetrator by omission is whether a reasonable person in the position of the caretaker, **knew or should have known** that acts of abuse were occurring and the parent or caretaker failed to take steps to remove the child from harm's way.

In ***Bucks Co. Child & Youth Soc. Servs. Agency v. Dep't of Pub***. 616 A.2d 170, 174 (Pa.Cmwlth. 1992) (emphasis in original).[4] Although this Court has not stated this principle as artfully as the Commonwealth Court, we have nonetheless applied it in cases involving child abuse by omission. ***See e.g. In the Interest of L.V.***, 127 A.3d 831, 837 (Pa.Super. 2015) ("Even assuming it was Father who directly caused Child's injuries, Mother knew, or should have known, that Child was being abused."); ***In the Interest R.P.***

---

[4] While we are not bound by the decisions of Commonwealth Court, we may cite the decisions of that court as persuasive authority. ***Petow v. Warehime***, 996 A.2d 1083, 1088 n.1 (Pa.Super. 2010).

957 A.2d 1205, 1214 (Pa.Super. 2008) ("Mother knew or should have known about Father's abuse of [child].").

The crux of Father's argument challenges the weight of the evidence. As explained *infra*, Father does not argue that there is insufficient evidence to support the juvenile court's ruling. Instead, highlighting that he was not present when Mother scalded A.B. with hot liquid on June 12, 2020, and invoking evidence favorable to his position that he had no reason to suspect that Mother was inflicting child abuse, Father asserts that the juvenile court erred in concluding that his conduct was reckless in failing to protect A.B. from Mother under these circumstances. **See** Father's brief at 25.

Father's position is founded upon his testimony that he did not have any knowledge of the numerous additional injuries that the body scans revealed after A.B. was admitted to St. Christopher's. He also relies upon Dr. Atkinson's testimony that she was not able to state with certainty when two of those latent injuries, the left shoulder fracture and the liver hematomas, occurred. Removing those injuries from the calculation, Father reasons that the remaining injuries, *i.e.*, A.B.'s fractured rib, fractured hand and bruised torso and face, "could easily have [been] missed" based on Father's limited interaction with his son. **Id**. at 23. In this vein, Father notes that an agency caseworker assigned to the family never voiced any concerns with A.B.'s appearance. Father's brief at 23. In addition, he highlights that A.B.'s broken bones and bruises were less severe than the injuries that the respective

victims endured in the two above-referenced cases where we upheld findings of abuse. *See In re R.P.*, *supra* (mother culpable for abuse by omission where 18 month-old child suffered multiple bruises, indications of skull, hip , and wrist fractures); *In re L.V.*, *supra* (seven-month-old child with twenty-three rib fractures in various stages of healing, internal organ damage, and acute subdural hemorrhage). As explained *infra*, Father's reliance on these cases is unavailing.

DHS counters that the evidence presented at the hearing established that Father was previously concerned about Mother's parenting skills and her treatment of A.B., including striking the child, but failed to act to prevent any future harm. Specifically, Father admitted that he had observed unexplained injuries and bruises on A.B.'s body and had serious concerns about Mother's parenting skills and her methods of disciplining A.B. Further, witnesses testified that Father admitted knowing that Mother hit A.B. and locked him in isolation. Moreover, DHS points out that, despite these concerns, Father took no action to remove A.B. from Mother's care or bring the abuse to the attention of DHS or the proper authorities. Hence, the DHS concludes that because Father knew, or should have known, of the dangerous and precarious situation with Mother, and recklessly failed to remove A.B. from harm's way, the

juvenile court properly found that Father was a perpetrator of abuse by omission.[5]

In addressing this issue in the Rule 1925(a) opinion, the juvenile court reasoned,

> After hearing expert medical testimony from Dr. Atkinson, the child abuse expert witness: credible, persuasive testimony from the DHS investigator, Nikkia R. Plunkett, and Glenda Rivera, DHS Social Worker Supervisor, this court found clear and convincing evidence existed to substantiate the allegations set forth in the petition filed by DHS for this child. . . . This court . . . found that this child was the victim of child abuse as defined at 23 Pa.C.S. §6303 (b.1)(1), "[t]he term 'child abuse' shall mean intentionally, knowingly or recklessly . . . causing bodily injury to a child through any recent act" by Mother and "failure to act" as to Father.
>
> . . . .
>
> Father testified he saw bruises on his son at various prior occasions. He testified that he knew Mother hit the child[6] and treated him differently than her other child. Then, in further testimony, Father denied making statements to Dr. Atkinson and Ms. Rivera about Mother's actions. Father testified he did not take his injured child to a doctor on various other occasions when he saw injuries because he did not have any documents. It is clear

_____

[5] DHS also highlights that: (1) Father's alleged attempt to obtain custody of A.B. in November 2019 is unsupported by any documentation in the certified record; and (2) that Father's concomitant assertion that the COVID-19 pandemic disrupted the ensuing custody proceeding scheduled for February 20, 2020, is belied by the fact that the Pennsylvania Supreme Court did not declare the COVID-19 statewide judicial emergency until March 16, 2020, approximately three weeks after the supposedly scheduled hearing.

[6] As the certified record does not support the court's finding that Father **testified** that he knew Mother hit the child, we do not consider it. For clarity, we note that Dr. Atkinson testified that Father informed her that Mother hit the child. Father has vigorously denied making this statement to Dr. Atkinson or anyone else. The juvenile court found that Father's denials lacked credibility.

to this court that Father knew his son was being abused by Mother, however, he did not remove A.B. from Mother's care. Father's testimony at the close of the hearing, when he opined that "Mother just needed to go to parenting class and that he did not see anything that concerned him," was also relevant to his ability to comprehend the critical need to provide a safe, and a healthy, environment for this child. This court found Father's testimony incredible and found that the totality of the evidence presented showed this court that Father is not ready, willing, and able to care for his son at this time.

Trial Court Opinion, 3/31/21 at 19-21.

We discern no abuse of discretion. The certified record supports the juvenile court's determination that Father consciously disregarded a substantial and unjustifiable risk that A.B. would be subject to abuse in Mother's care. The record bears out that Father was aware of prior incidents of abuse and Mother's mental health problems. Indeed, he noted his concerns about Mother's behavior to both Dr. Atkinson and DHS investigators and specifically indicted her parenting skills, discipline, and apparent indifference toward the wellbeing of her one-year-old son. N.T., 2/9/21, at 63-65, 67, 90.

Contrary to Father's contentions, the comparative severity of the victims' injuries in *In re R.P.*, and *In re L.V.*, is of no moment in this case. The determinative factor is not the extent of A.B.'s physical trauma, but whether Father knew or should have known of the risk of bodily injury to A.B. and failed to act to prevent it. In *In re R.P.*, and *In re L.V.*, we highlighted the number and severity of the injuries in order to infer that the perpetrator by omission had ignored clear evidence of abuse. Unlike the parents in those cases, Father admitted to observing evidence of Mother's potential abuse of

A.B. As Father's statements satisfy the knowledge element of the determination, it is unnecessary to focus on the comparative severity of A.B.'s injuries.

Furthermore, although Father subsequently denied observing some signs of child abuse and asserted that he acted properly to avoid others, *i.e.* his undocumented claim that he filed for physical custody in November 2019, the juvenile court simply found Father's assertions lacked credibility. **See** Trial Court Opinion, 3/31/21, at 21. Father is essentially requesting this Court to overturn the juvenile court's credibility determination in favor of Dr. Atkinson and the DHS child abuse investigator, and make a new determination that adopts Father's testimony. As the certified record supports the court's assessment of the witnesses' credibility, we cannot disturb it. **See In re L.Z.**, **supra** at 1174 (appellate court must accept findings of fact and credibility determinations that are supported by the record). For all of the foregoing reasons, we find that the juvenile court did not abuse its discretion in finding that the certified record supported the finding that Father was a perpetrator of child abuse by omission insofar as he recklessly created a likelihood of injury by failing to act when he knew or should have known that acts of abuse were occurring. **See Bucks Co. Child & Youth Soc. Servs. Agency**, **supra**; **In the Interest of L.V.**, **supra**; **In the Interest of L.V.**, **supra**.

Finally, we address Father's contention that the juvenile court abused its discretion in adjudicating A.B. dependent pursuant to 42 Pa.C.S. § 6302.[7]

The Juvenile Act defines a dependent child, in relevant part, as a child who,

> is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302.

As we previously explained, "[t]he petitioner bears the burden of proof in a dependency hearing, and must prove by clear and convincing evidence that (1) the child is presently without proper parental care or control; and (2) such care and control is not immediately available." *In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003) (citation and quotation marks omitted). Proper parental care is defined as "that care which (1) is geared to the particular needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In the Matter of C.R.S.*, 696 A.2d 840, 845 (Pa.Super.1997). Moreover, "the dependency of a child is not determined as to a particular person, but rather must be based upon two findings by the trial court: whether

---

[7] As Father does not challenge the juvenile court's removal of A.B. from Mother or the child's placement in the legal custody and care of DHS, we do not address that aspect of the disposition.

the child is currently lacking proper care and control, and whether such care and control is immediately available." *In re J.C.*, 5 A.3d 284, 289 (Pa.Super. 2010) (cleaned up).  Furthermore, "a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent." *In re E.B.*, 83 A.3d 426, 433 (Pa.Super. 2013) (citation omitted).  Significantly, when an adjudication of dependency is premised on a finding of child abuse supported by clear and convincing evidence, the finding of abuse may support the adjudication of dependency.  *In the Matter of C.R.S.*, *supra* at 843.

Father argues that the record does not support the adjudication of dependency because he: 1) acted appropriately during the ordeal on June 12, 2020, by immediately transporting A.B. to the hospital upon being informed of the injury and observing his son's condition; 2) denied any knowledge of the additional injuries that were discovered after A.B.'s admission to St. Christopher's; 3) responded suitably to his concerns with Mother's parenting skills and treatment of A.B.; and 4) made himself available to take A.B. home following his discharge from St. Christopher's.  *See* Father's brief at 26-27.  In sum, Father concludes that he "did everything that any responsible parent would do to ensure A.B's safety and wellbeing." *Id* at 27.

Citing *In the Matter of C.R.S.*, *supra*, DHS argues that the adjudication of dependency is supported by the juvenile court's finding of child abuse by clear and convincing evidence.  DHS brief at 24-25.  Similarly, in

adjudicating A.B. dependent, the juvenile court reasoned that the same conduct that supported the finding that Father was a perpetrator of abuse by omission sustained the finding that Father was not able to provide care and safety for his son. Trial Court Opinion, 3/31/21, at 20-21. We agree.

As we explained in *In the Matter of C.R.S.*, *supra*, a finding of child abuse by clear and convincing evidence, which we have in the case at bar, supports the concomitant adjudication of dependency. We stated as follows: "A finding of abuse may support an adjudication of dependency. When the court's adjudication of dependency is premised upon physical abuse, its finding of abuse must be supported by clear and convincing evidence. *Id*. at 843 (citations omitted).

As previously discussed, the trial court's finding of child abuse by omission was founded upon clear and convincing evidence. Again, the trial court found credible testimony establishing that Father was concerned about Mother's treatment of A.B. and her methods of discipline, even noting that Mother hit their one-year-old son, and observed unexplained injuries on the child, but then failed to act to prevent any future harm. That conscious disregard of the substantial and unjustifiable risk of continued child abuse was tantamount to abuse by omission. Indeed, even after the heinous immersion burns that A.B. suffered at Mother's hands, Father defended Mother. He not only questioned the continuing necessity of the subsequent child abuse investigation, but during the ensuing hearing, he suggested that Mother

simply needed to complete a parenting class. Father's disconnect with the gravity of Mother's actions is telling.

The preceding clear and convincing evidence that established that Father was a perpetrator of abuse by omission was also sufficient for the juvenile court to adjudicate A.B. a dependent child without immediately available proper parental care or control. *In the Matter of C.R.S.*, *supra* at 843. As the trial court's finding of child abuse by Father is supported by clear and convincing evidence, the juvenile court did not abuse its discretion in adjudicating A.B. dependent.

For all of the foregoing reasons, the trial court did not abuse its discretion or commit an error of law in finding that Father committed child abuse by omission and by adjudicating A.B. dependent, with a permanency goal of reunification. Accordingly, we affirm the juvenile court's February 9, 2021 order of adjudication and disposition

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/20/2021