J-S75001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: I.B.A., MOTHER | : : : : : | |
| | : | No. 2117 EDA 2018 |

Appeal from the Order Entered July 2, 2018
In the Court of Common Pleas of Monroe County
Civil Division at No(s): CP-45-DP-0000120-2017

BEFORE: PANELLA, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY PANELLA, J. **FILED JANUARY 07, 2019**

Appellant, I.B.A. ("Mother"), files this appeal from the order adjudicating her son, A.A. ("Child"), dependent and placing him in foster care.[1] Mother challenges the finding of dependency and the decision to place Child in foster care. We conclude the court did not abuse its discretion on either issue, and affirm the court's order.

The court summarized the relevant procedural and factual history as follows:

### BACKGROUND

[Child] is [a] nine year-old boy who is entering fifth grade. He has special needs. [Child] has been diagnosed with ADHD and Oppositional Defiant Disorder, has speech delays, and has motor skill deficits, including an inability to tie his own shoes. He has been prescribed medications, including psychotropic medications, to address these issues. At school[, Child] has an Individualized

---

[1] Child's father, J.A. ("Father"), did not separately appeal the adjudication and disposition.

Education Plan. He is currently in foster care. (N.T., 6/21/2018 (Shelter Care Hearing), Exhibit 1; N.T., 6/27/2018 (Adjudication and Disposition Hearing), pp. 8, 30-32, and Exhibits 3 and 4).

[Child] has a sister who is 17 years-old [sic]. She, too, has special needs. [Child]'s sister was adjudicated dependent in November of 2017 and has been in care out of the home ever since.

This family first came to the attention of Monroe County Children and Youth [S]ervices ("CYS" or the "Agency") in November of 2017[,] when the Agency received a referral that [Child]'s sister attempted suicide after she was sexually abused by the children's father ("Father"). Specifically, [Child]'s sister reported that Father sexually abused her and that she told Mother about the abuse, but Mother did nothing to help or protect her. The sexual abuse allegations were investigated by both the Agency and the police. (Shelter Care Application, filed November 20, 2017; Dependency Petition, filed November 27, 2017; N.T., 6/21/2018, pp. 4-5 and Exhibit 1; N.T., 6/27/2018, Exhibits 1 and 2).

After the sexual abuse referral was received, both children were taken into emergency protective custody. At the ensuing shelter care hearing, protective custody was continued. Later, after a dependency hearing, [Child]'s sister was adjudicated dependent. She was placed in kinship foster care with Maternal Grandparents who came here from New York to care for her. As noted, A.A.'s sister remains dependent. [Child] was not adjudicated dependent. He returned home to Mother and Father.

Subsequently, CYS investigated the allegations made in the referral. Father was indicated for sexual abuse and Mother was indicated for failure to protect. Mother has filed an administrative appeal.[2] (N.T., 6/21/2018, pp. 4-5; N.T., 6/27/2018, pp. 21 and 25).

Consistent with what [Child]'s sister reported, Mother aligned herself with Father. With the exception of one brief period, discussed below, Mother has by her words and actions

---

2 Father administratively appealed the findings of abuse as to A.A.'s sister, as well. N.T., 6/27/18, at 25-26. The results of these administrative appeals are not apparent from the certified record.

demonstrated that she does not believe her daughter. In this regard, Mother does not visit with [Child]'s sister and did not allow visits between the siblings while [Child] was in her care. (N.T., 6/21/2018, pp. 6-8; N.T., 6/27/2018, pp. 6. 38, 39-41 and Exhibit 1).

In late February, 2018, Mother informed the family's CYS caseworker that she had read a letter from her daughter which, at the time, caused her to believe her daughter's allegations against Father. When Mother confronted Father, an altercation ensued. During the altercation, Father admitted to abusing their daughter. In addition, Father strangled Mother and threatened Maternal Grandfather and Mother's best friend, both of whom were present. (N.T., 6/21/18, pp. 5-7, 13; N.T., 6/27/2018, pp. 23-25).

Mother spoke with the police and a CYS caseworker. At that point, Mother did not want charges filed against Father. (*[Id.]* at 5-6).[3] She did, however, go to the courthouse to obtain a temporary Protection from Abuse Order. When she was too late to obtain a PFA, the caseworker helped work out an arrangement by which the police would escort Mother to the house to retrieve some belongings. While Mother, Maternal Grandfather, and Mother's best friend were in Mother's car waiting for the police escort, Father violently crashed his vehicle into them. All three were injured, with Maternal Grandfather receiving the most severe injuries, and Mother and her friend were trapped in the car. Father approached the car and said to the entrapped occupants, "I'm glad your *[sic]* dead, I killed you all." (N.T., 6/21/18, pp. 5-7; 13; N.T., 6/27/2018, pp. 23-25 and Exhibit 5; *(Commonwealth v. [Father], No. [] Criminal 2018, Affidavit of Probable Cause).*[4]

As a result of the vehicular assault, Father was arrested and charged with multiple counts of Attempted Homicide, Aggravated Assault, Simple Assault, and Recklessly Endangering Another Person. He has been incarcerated ever since. (N.T., 6/21/18, pp. 3, 7; N.T., 6/27/2018, p. 23 and Exhibits 1 and 5).

---

[3] CYS caseworker, Amanda DeMatteo, testified at the shelter care hearing that, after initially not wanting to file charges against Father, Mother then changed her mind. N.T., 6/21/18, at 6.

[4] The affidavit of probable cause is not included as part of the certified record.

Shortly thereafter, in early March of 2018, the police concluded their investigation into the sexual abuse allegations. Father was charged with two counts of Aggravated Indecent Assault, six counts of Indecent Assault, Endangering the Welfare of a Child, Corruption of a Minor, and Unlawful Contact With a Minor. (N.T., 6/21/2018, p. 5-6; N.T., 6/27/2018, p. 21 and Exhibits 1 and 5).

As noted, at the time the vehicular assault occurred, Mother had had a change of heart regarding her daughter's allegations against Father. In addition to the family's caseworker, Mother expressed to the police that she believed her daughter. However, her change of heart was short[-]lived. Incredibly, even after Father had confessed to her what he had done to their daughter and assaulted her with a vehicle, and despite the fact that Father had been charged for his criminal conduct against both Mother and [Child]'s sister, Mother re-aligned herself with Father and reverted back to disbelieving her daughter. (N.T., 6/21/2018, pp. 7-9, 13; N.T., 6/27/2018, Exhibit 1).

In fact, Mother doubled down on her support of Father and her disbelief of her daughter. Mother told a CYS caseworker that her daughter was to blame for the car crash because if her daughter had not told on Father, then Father would not have crashed his vehicle into Mother's car. (N.T., 6/21/18, pg. 7). Family members, particularly on the paternal side of the family, followed Mother's lead by aligning themselves with Father and vocalizing that they believed A.A.'s sister was lying. (N.T., 6/21/2018, pp. 7-9, 13; N.T., 6/27/2018, Exhibit 1).

Mother also made affirmative efforts to obtain Father's release from jail by attempting, through harassment, threats, and verbal abuse, to get the friend who was with her during Father's in-person assault and the vehicular assault to change her story. As a result, in [June] of 2018, Mother was arrested and charged with Intimidation of a Witness and Solicitation to Commit Perjury, both of which are felony offenses.[5] (N.T., 6/21/2018, pp. 3, 9, and Exhibit 1; N.T., 6/27/2018, pp. 3, 24, and Exhibits 1 and 6). . . .

---

[5] Mother was arrested on June 19, 2018. *See* N.T., 6/21/18, at 9; *see also* Exhibit 2, 6/21/18; *see also* Exhibit 6, 6/27/18.

- 4 -

Based on its history with and the needs of this family, CYS developed a Family Service Plan ("FSP"). The FSP was approved by this [c]ourt in [Child]'s sister's dependency proceeding. The Agency has provided or attempted to provide services in accordance with the FSP and has monitored Mother and Father's compliance and non-compliance with the plan. (N.T., 6/21/2018, Exhibit 1; N.T., 6/27/2018, Exhibit 2).

The FSP summarizes the background of the case. Of significance, the plan reiterates both the CYS's finding that Mother was a perpetrator by omission for failure to act to protect her daughter and the Agency's concern about Mother's lack of protective capacities. The plan also notes that [Child] was at risk for removal. Goals were set to address the Agency's concerns, the children's needs, and their safety. Among other things, Mother was to visit her daughter, engage in forensic counseling to address issues stemming from the sexual abuse, and work toward increasing her protective capacities for both children. Additionally, the Agency was to monitor and check on [Child]'s safety. (N.T., 6/21/2018, Exhibit 1; N.T., 6/27/2018, Exhibit 2).

Mother was aware of her FSP goals. However, she has failed and refused to work on them. Mother did not visit or otherwise work toward reunification with her daughter. She declined to attend forensic counseling. She did not allow [Child] to visit with his sister. She sided with Father against their daughter on the abuse allegations. She did not work on strengthening her protective capacities. Indeed, as to this goal, Mother by her actions elevated concerns about her ability to protect [Child]'s health, safety, and welfare. Of extreme significance, Mother did not allow the Agency to check on [Child]'s safety while he was in her care, at one point ordering a CYS caseworker from her residence, and until emergency protective custody was taken of [Child], stopped communicating with the family's caseworker. Mother's refusal to allow CYS access to [Child] coincided with the period during which Mother was: 1) siding with Father, apparently in both criminal matters, even after he strangled her and then assaulted her with a vehicle; 2) disbelieving [Child]'s sister, even after Father confessed to Mother what he had done to their daughter and had been charged with felony sex offenses; 3) intimidating and harassing her friend who was a witness or potential witness in both of the criminal cases filed against Father; and 4) declining to permit visits between the siblings. At the same time, Mother was visiting Father in prison on a weekly basis and regularly speaking

with him on the phone. On at least one occasion, Mother put [Child] on the phone with Father[,] despite a condition of Father's bail that prohibited such contact. (N.T., 6/21/2018, pp. 4-5, 7-9, 13, and Exhibits 2 and 3; N.T., 6/27/18 pp. 5-7, 16-17, 23-24, 35, 37-41, 43, and Exhibits 1, 5, and 6).

[Child] came into care when Mother was arrested on the Witness Intimidation and Solicitation charges and incarcerated in lieu of $100,000 bail. At that time, no suitable relatives were available to care for [Child]. Maternal grandparents wanted to be resources. Unfortunately, Maternal Grandfather was back in New York still recovering from the injuries sustained as a result of the vehicular attack by Father and Maternal Grandmother had returned to New York to care for both [Maternal Grandfather] and her mother, who was terminally ill. Mother proposed paternal relatives; however, they were deemed unsuitable because they were aligned with Father. Finally, the facility in which [Child]'s sister had been placed had no room for [Child]. As a result, [Child] was taken into emergency protective custody and placed in foster care. (N.T., 6/21/2018, pp. 3, 9, 11-17; N.T., 6/27/2018 pp. 3, 7-8, 13, 17).

As of the date of the shelter care hearing, Mother and Father were still incarcerated. At the conclusion of the hearing, [p]rotective custody was continued.

After the shelter care hearing, [Child] and his sister began visits. Despite Mother's prior indication to caseworkers that [Child] expressed no interest in seeing his sister, the two children have enjoyed the visits and have interacted as normal siblings.

Between the shelter care hearing and the adjudication hearing Mother was released on bail. According to the attorney who represents Mother in this case, the criminal matter, and her administrative appeal, posting bail for Mother was the product of a "tremendous effort on both sides of the family to get mom's liberty." (N.T., 6/27/2018, pp. 44-45).

An adjudication and disposition hearing was convened on June 27, 2018. The family's CYS caseworker[6] testified and the Agency admitted several exhibits. The facts and history presented by the Agency is summarized above. The Agency asked for dependency and placement of [Child].

Mother testified.[7] She asked that [Child] be returned to her. Mother said that, if [Child] were returned to her, she would follow the same plan of care that she had prior to her incarceration. Specifically, [Child] would commute with her to New York. During the day, while she worked in Yonkers, [Child] would be cared for in New York City by a longtime baby sitter, her parents, or paternal relatives, many of whom live there. After work, Mother would pick [Child] up and return to Pennsylvania. (*[Id.]* at 28, 31-32). She did not, however, indicate what her plan would be during the school year, other than to leave open the possibility of moving with [Child] to New York. During her testimony, Mother acknowledged her continued visitation and phone contact with Father.

[Child]'s guardian *ad litem* ("GAL"),[8] who is also his sister's GAL, agreed that [Child] should be adjudicated dependent and placed

---

[6] CYS caseworker, Amanda DeMatteo, also testified at the adjudicatory hearing on June 27, 2018.

[7] Father remained incarcerated in the Monroe County Correctional Facility at the time of the adjudicatory hearing and was not present. N.T., 6/27/18, at 3-4.

[8] This Court extended the requirements of *In re Adoption of L.B.M.*, 161 A.3d 172, 174 (Pa. 2017), and its progeny to dependency actions generally. *See L.B.M.*, *supra* (the issue decided was whether 23 Pa.C.S.A. § 2313(a), which mandates the appointment of counsel for children involved in contested involuntary termination of parental rights proceedings, is satisfied by the appointment of a GAL provided that the GAL is an attorney.); *see also In re T.S.*, 192 A.3d 1080, 1089-1090 (Pa. 2018) (holding that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome.); *see also In re J'K.M.*, 191 A.3d 907 (Pa. Super. 2018) (reversing order denying appointment of a separate counsel for dependency proceedings where there was a conflict

- 7 -

in care through the Agency. The GAL indicated that she had serious concerns about returning [Child] to Mother due to the history recounted above and the web of "alliances and allegiances and stories" being spun by Mother and woven by [Child]'s other family members. The GAL believed that [Child] was being used as a pawn and treated as a yo-yo in a way that adversely affected his health, safety, and welfare. The GAL also opined that the renewed visitation between [Child] and his sister has been positive. Conversely, the GAL noted her position that it was not in [Child]'s best interests to be put on the phone with Father, over a contrary bail condition, while Father was in jail after being charged with sexually abusing his sister and attempting to kill Mother, or, if he were to be returned to Mother, to be subjected to a "commuter's schedule." ([*Id.*] at 46-47).

Trial Court Opinion, 9/6/18, at 1-9 (footnotes omitted).

By order dated June 27, 2018, and entered July 2, 2018, the court adjudicated Child dependent and found it in his best interests to be removed from Mother's home and remain in the custody of CYS and in foster care.

Thereafter, on July 9, 2018, Mother filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother filed a subsequent notice of appeal, with an amended caption, on July 10, 2018. The court issued a Statement Pursuant to Pa.R.A.P. 1925(a) dated September 5, 2018, and entered September 6, 2018, in support of its order.

On appeal, Mother raises the following issues for our review:

_____

between the child's best interests and legal interests). Instantly, the certified record does not suggest a preference and a conflict is not discernible. If the trial court determines there is a conflict between Child's preference and his best interests, the court must appoint separate legal counsel to advocate for those disparate interests in future proceedings.

- 8 -

Does Dependency Court commit reversible error where no disposition hearing is held after finding of dependency?

Does Dependency Court commit reversible error where it finds a child dependent and removes a child from its mother's home without any findings of 1) aggravating factors 2) failure to find less restrictive alternatives than removal of child from home such as 3) mandated agency supervision or alternative kinship with child's maternal grandparents who have served in such capacity in the past?

Does Dependency Court commit reversible error where it finds a child dependent by "clear and convincing evidence" where record does not substantiate such a finding and [c]ourt does not cite to the record of factual basis for its findings?

Mother's Brief at 9 (suggested answers omitted).

Our standard of review for dependency cases is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted); *see also In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

In her first issue, Mother contends the court erred when it did not hold a separate disposition hearing. In juvenile dependency matters, "disposition" refers to the court's determination of physical custody of a dependent child. *See*, *e.g.*, 42 Pa.C.S.A. § 6351(a). Pursuant to 42 Pa.C.S.A. § 6341(c), "If

- 9 -

the court finds from clear and convincing evidence that the child is dependent, the court shall proceed immediately or at a postponed hearing, which shall occur not later than 20 days after adjudication if the child has been removed from his home, to make a proper disposition of the case." Thus, the court was not required to hold a separate disposition hearing. Mother's first issue on appeal is meritless.

Next, Mother combines several distinct arguments into an overarching challenge to the court's finding of dependency and placement into foster care. Since Mother's third issue is a direct challenge to the court's finding of dependency, we will treat this issue as a challenge to the court's decision to place child in foster care.

Once a child is adjudicated dependent, the trial court is to determine who shall have custody of the child as well as what services should be provided to the child and family. Disposition of a dependent child is governed by 42 Pa.C.S.A. § 6351, which states in pertinent part:

> **(a) General rule.—**If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child:
>
> (1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.
>
> (2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

Thus, the trial court may make an appropriate disposition in order to protect the child's physical, mental and moral welfare, including transferring temporary custody to a public agency. *See In re M.L.*, 757 A.2d 849, 850–51 (Pa. 2000).

Even after a child has been adjudicated dependent, however, a court may not separate that child from his or her parent unless it finds that the separation is clearly necessary. Such necessity is implicated where the welfare of the child demands that he [or she] be taken from his [or her] parents' custody.

*In re G.T.*, 845 A.2d 870, 873 (Pa. Super. 2004) (citations and quotation marks omitted) (alterations in original).

Here, the court addressed Mother's argument as follows:

Mother's claim that we also erred by removing [Child] from the home and placing him in non-kinship foster care may be disposed of quickly. We found that removal was at once necessary and in [Child's] best interests for the same reasons why we adjudicated him dependent. Since we have exhaustively stated those reasons and our findings above, we need not repeat them here. In addition:

We did not believe that Mother's plan to "commute" with [Child] was in his best interests, given that it would on a daily basis

- 11 -

remove him from the oversight of the Agency and the jurisdiction of this [c]ourt, place him at times with, or at least in proximity to, paternal relatives whose loyalties were clearly for Father and Mother and not the children, and require inordinate travel. Further, there was no plan enunciated for school, which has now begun. At [the] hearing, we indicated that Mother's plan to "commute" with [Child] could not by itself be grounds for dependency. However, we noted that it would be relevant to custody and placement decisions.

Further, it was apparent to us that Mother is more focused on defending all actions filed against her and Father than she is on promoting and protecting the interests of [Child]. We do not suggest that Mother should not appeal the indicated finding, defend the Intimidation of a Witness case, or contest this action. She has an absolute right to do so. However, at the same time, Mother has an obligation to parent and to provide for [Child's] health, safety, and welfare. The record demonstrates that Mother has not satisfied those obligations, instead putting her own interests and the interests of Father above the well-being of her son.

Mother's assertion that removal was improper because aggravated circumstances were not found is baseless. While the existence of aggravated circumstances can certainly be considered when making a dependency finding, fashioning disposition, or making placement decisions, there is no requirement that such circumstances be found before a child may be removed from the home.

Mother's suggestion that we failed to consider less restrictive alternatives, such as Agency supervision or kinship placement with [M]aternal Grandparents is belied by the record. The record amply demonstrates that, over the course of the Agency's history with this family, less alternative placements were considered and, in fact, employed. [Child's] sister was placed with Maternal Grandparents. Child remained in the home for months after his sister was adjudicated dependent and placed in kinship care. Leaving [Child] in the home with, to use Mother's own term, "Agency supervision" was an attempt to prevent [Child's] removal and employ the least restrictive alternative possible. Unfortunately, due largely to Mother's actions, the attempt was not successful. Since Mother had by her actions shown that she is not amenable to Agency supervision or services and lacks

- 12 -

protective capacities, there was no need to even attempt placement in the home. Further, contrary to the suggestion in Mother's Rule 1925(b) statement, kinship care was considered. In fact, it was considered as the preferred out-of-home placement option. However, for the reasons discussed, Maternal Grandparents were not available as placement resources, paternal relatives were not appropriate placement resources, and no other relatives were immediately available.

Trial Court Opinion, 9/6/18, at 19-21.

The record supports these findings. In addition, the court's reasoning is not an abuse of its discretion. Thus, Mother's second issue on appeal merits no relief.

Finally, Mother claims the record does not support the court's dependency finding.

> [T]o adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:
>
> > is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.
>
> 42 Pa.C.S.[] § 6302(1). "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re C.R.S.,* 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted).
>
> In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see* 42 Pa.C.S.[] § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such

- 13 -

care is not immediately available." ***In re R.T.,*** [ ] 592 A.2d 55, 57 (Pa. Super. 1991) (citation omitted). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." ***In re C.R.S., supra*** at 845 (citation omitted).

***In re A.B.***, 63 A.3d 345, 349 (Pa. Super. 2013).

The court addressed mother's challenge with the following reasoning:

In her second and third assignments of error, Mother alleges that we erred by adjudicating [Child] dependent and placing him in foster care. Essentially, she contends that there was insufficient evidence of either dependency or the need to remove [Child] from the home. Contrary to Mother's assertions, the record demonstrates that CYS proved dependency by clear and convincing evidence and that removal from the home was both necessary and in [Child]'s best interests.

. . .

In this case, we adjudicated [Child] dependent because we found that CYS proved by clear and convincing evidence that [Child] was without proper care and control and that such care and control were not immediately available. Given the facts and circumstances of this case, summarized above, our findings and conclusions were fully supported by the record and the applicable law.

Our decision was based on the facts and history of this family from the time they first came to the attention from the Agency. By her acts and omissions, Mother has continuously demonstrated a lack of both protective capacities and the ability to provide care and control that is necessary for [Child's] physical, mental, and emotional, health, safety, and welfare. Mother failed to protect [Child]'s sister from or to report the abuse of his sister perpetrated by Father. As a result, Mother was indicated as a perpetrator by omission. Standing alone, Mother's failure to act and protect could under the law summarized above be enough to support a finding of dependency.

However, Mother's failure to act and to protect [Child's] sister does not stand alone.

- 14 -

Last November, [Child] was allowed to remain in the home because Maternal Grandparents became involved and it was determined that, with their intervention, the involvement of the Agency, and casework services in place, there was a sufficient level of care and control, as well as enough safeguards, so that dependency was not at the time warranted. However, it was clear that this determination and [Child's] safety were dependent on Mother's (and at the time Father's) cooperation with the Agency, her compliance with the family service plan, especially increasing her protective capacities, and her demonstration of proper parenting, care, and control of [Child] even while the Agency and the police were investigating the abuse allegations. In short, contrary to Mother's assertions, the Agency actively worked to prevent [Child's] removal from the home in a manner that was designed to have regard for his safety and wellbeing. Unfortunately, Mother failed to cooperate, did not increase or even attempt to work on her protective capacities, and put her own interests, including a troubling defense of Father, above [Child's] interests.

Specifically, Mother failed and refused to work on her FSP goals. Mother did not visit or otherwise work toward reunification with her daughter. She declined to attend forensic counseling. She did not allow [Child] to visit with his sister. She did not work on strengthening her protective capacities. Quite the opposite, she doubled down on her failure to protect by continuing to side with Father against their daughter in the sexual abuse case (and, apparently, is siding with him in the Attempted Homicide case as well) even after Father confessed to Mother what he had done, strangled Mother when she confronted him, and assaulted Mother, Maternal Grandfather, and Mother's friend with a car. Then, in a bizarre turn of events, Mother parlayed her double parental miscue by harassing and threatening her friend in an attempt to get the friend to change her story because Mother wanted Father out of jail. Further, and of extreme significance, Mother did not allow the Agency to check on [Child's] safety, at one point ordering a CYS caseworker from her residence. Similarly, until emergency protective custody was taken of [Child], Mother stopped communicating with the family's caseworker. At the same time, even after all that he had done to her and the family, Mother was visiting Father in prison on a weekly basis and regularly speaking with him on the phone. On at least one occasion, Mother put [Child] on the phone with Father despite a

condition of Father's bail that prohibited such contact. Finally, as the GAL aptly observed, [Child] was caught in a web of "alliances and allegiances and stories" being spun by Mother and woven by other family members, especially on Father's side of the family, and is being used as a pawn and treated in a way that is adverse to his health, safety, and welfare, as support of Mother and Father is being generated. All of this, and more, occurred while [Child], a special needs child, was in Mother's care.

At [the] hearing, Mother indicated she did not believe the criminal cases were having or would have an adverse impact on [Child]. This speaks volumes. The several court cases in which the family is involved have obviously impacted [Child], even if he has not [been] informed about specifics. Even more, what Mother does not seem to grasp, the conduct, acts, and omissions of one or both parents that gave rise to the three criminal cases, the dependency of [Child's] sister, and this proceeding have adversely impacted [Child]. The same conduct demonstrates Mother's lack of protective capacities as well as her inability to provide the parental care and control that is necessary for [Child]'s physical, mental, and emotional, health, safety, and welfare.

Borrowing language from the Superior Court's decision in [*In re M.W.*, 842 A.2d 425 (Pa. Super. 2004)], as well as other cases cited above, the Act is sensitive to the fact that siblings of sexually abused children may be "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals." When, while A.A. was in Mother's care: [Child's] sister was abused by Father in the home and Mother did nothing to stop it ... Mother thereafter sided with Father against [Child's] sister and then completely abandoned her parental responsibilities toward her daughter ..[.] Mother continued regular contact with Father even after all that Father had done to their daughter, their family, and to Mother herself ... Mother, over a bail restriction, put [Child] on the phone with Father after all that had transpired ... and Mother resorted to criminal conduct against her friend, who is a witness in more than one criminal case, in an unsettling attempt to aid Father, [Child] was rendered "so emotionally vulnerable that he may be considered lacking in proper care and control." Our focus was not on whether [Child] was himself at risk of sexual abuse, especially after Father was incarcerated. Rather, "the key question [wa]s whether [Child] fit the broader definition of lacking "proper parental care or control, subsistence, education as

- 16 -

required by law, or other care or control necessary for his physical, mental or emotional health, or morals." Based on the record presented, we found that the Agency had answered this question in the affirmative by the requisite clear and convincing evidence. We stand by that finding.

Trial Court Opinion, 9/6/18, at 10, 15-22.

With this, we agree. Upon review, we find no abuse of discretion. Furthermore, the court's factual findings are well supported by the record. Mother's final issue on appeal merits no relief.

In summary, the court found Mother's reactions to Child's sister's allegations of abuse revealed that Child was without proper parental care and control. In addition, the general family atmosphere of supporting Father against Child's sister caused a situation where Child was at risk of being used as a pawn in Father's legal process. Mother did not present an educational plan that indicated she was prioritizing Child's needs, and her commuting scheduled posed a danger that CYS would be unable to monitor Child's health and welfare effectively. Maternal Grandparents are unable to care for Child at this time, and Paternal Grandparents are unsuitable due to their involvement with Father's legal defense. No other kinship guardians were proposed. The record supports these findings under a standard of clear and convincing evidence. Thus, we affirm the court's order declaring Child dependent and placing him in foster care.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/7/19