J-S13034-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.D. AND D.R., BIOLOGICAL PARENTS | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1836 MDA 2019 |

Appeal from the Dispositional Order Entered October 10, 2019
In the Court of Common Pleas of Centre County Juvenile Division at
No(s): CP-14-DP-0000014-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.D. AND D.R., BIOLOGICAL PARENTS | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1837 MDA 2019 |

Appeal from the Dispositional Order Entered October 9, 2019
In the Court of Common Pleas of Centre County Juvenile Division at
No(s): CP-14-DP-0000016-2017

BEFORE:  STABILE, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED APRIL 03, 2020**

J.D. (Father) and D.R. (Mother) (collectively, Parents) appeal from the

orders entered in the Court of Common Pleas of Centre County (trial court)

adjudicating dependent their two daughters, R.D. (born August 2003) and

---

[*] Retired Senior Judge assigned to the Superior Court.

A.D. (born April 2010) (collectively, Children), and placing them in kinship care. We affirm.

**I.**

Father and Mother are the natural parents of two sons, T.D. (born July 2001) and D.D. (born December 2006) as well as two daughters, R.D. and A.D. In 2011, Centre County Children and Youth Services (CYS) opened protective services with the family because of concerns with home conditions, mental health concerns with the children and truancy issues. Protective services ended in 2012 but were resumed in 2016 and have remained open. In May 2017, all four minors were adjudicated dependent but remained in the family home. However, in July 2017, T.D. was placed in a group home because of allegations that he sexually assaulted R.D., which CYS investigated and determined to be true. That same month, R.D. was admitted into an inpatient psychiatric facility for two weeks. Upon her discharge, she was referred to a psychologist for trauma therapy and prescribed medication.

In September 2017, D.D. was placed in a group home because of, among other reasons, violent behavior and suicidal threats. His behavior improved at the group home and, in February 2018, he returned home. However, when D.D.'s behavior regressed in the home and R.D. began to miss school, have panic attacks and allow her personal hygiene to decline. After she attacked D.D. and threatened her family, R.D. was admitted again into

inpatient psychiatric treatment in April 2018. A week later, on April 20, 2018, D.D. was placed back in the group home.

When R.D. returned home, though, she improved greatly, as did her younger sister, A.D. Both were regularly attending school and counseling and by all indications were thriving. Additionally, home conditions, which had always been a concern, had steadily improved. T.D. and D.D. had caused substantial property damage, including broken walls and exposed electrical wires, which were repaired since they left the house. As a result, on January 19, 2019, the trial court determined that Children were no longer dependent and terminated supervision but ordered that protective services remain open for CYS to monitor the condition of the home and ensure Children were attending school and counseling.

According to CYS, R.D. began to decline when supervision ended. By March 2019, she showed signs of depression, including locking herself in her room and poor personal hygiene. This continued through the end of the school year with her frequently missing school, as well as A.D. regularly being tardy at her school. Around this time, CYS also began to see the condition of the home regressing from its past improvement.

Children began the new school year in August 2019. After attending the first day, R.D. was absent for the next two weeks. During this time, CYS continually sent a caseworker for home visits but she was unable to make contact with anyone, even though R.D. was presumably home as well as one

of Parents' cars being in the driveway. Concerned with the situation, a CYS caseworker spoke with A.D. at her school. She related that R.D. had been sick and was often unable to get out of bed. When asked about counseling, A.D. said that she had started seeing a new therapist but R.D. was no longer seeing hers. This was the first time that CYS learned that neither R.D. nor A.D. were seeing their original psychiatrist. Just a few weeks before, Parents told CYS that they had no plans to withdraw Children from therapy with their psychiatrist and seek someone new.

The relationship between CYS and Parents continued to deteriorate when CYS began to suspect that T.D. was visiting the home without supervision. T.D. turned 18 at the end of July 2018 and decided to leave the care of CYS. Because he was living nearby and never completed sexual offender counseling, CYS told Parents that T.D. could not live at the house or have unsupervised contact with Children. However, during a visit to the home in August 2019, CYS observed T.D.'s duffle bag and Mother admitted that she was doing his laundry. During another visit, Mother told CYS that she would no longer provide information about T.D. to CYS.

Based on these accumulating concerns, on September 16, 2019, CYS filed dependency petitions for Children, alleging that they lacked proper parental care or control. The trial court appointed counsel for Parents and a guardian *ad litem* (GAL) for Children and scheduled a hearing for September 27, 2019. Before the scheduled hearing, CYS confirmed that R.D. was no

longer seeing her therapist and was now on a waitlist for a new therapist. When CYS indicated that it intended to request the removal of Children from the home, Parents requested a continuance that was granted under the condition that they agree to a safety plan with CYS and sign releases for all information pertaining to Children. After Parents complied, the dependency hearing was continued to October 9, 2019.

At that hearing, CYS presented Nicole Williams (Williams), a CYS caseworker assigned to the family since 2015. Besides relating the above history and concerns, Williams updated the trial court on Children's school attendance. A.D. had been late for school at least six times since beginning the school year. Williams suggested that A.D. ride the bus to school but Parents insisted they drive her so she did not have to wake up early. As for R.D., she had recently enrolled in virtual school because she was absent for the first month of school and her issues with anxiety. Despite being enrolled for only a week, R.D. was almost 12 hours behind on her homework within the first week of virtual school.[1] Williams worried about R.D. being left home alone during the day because of her mental health history.[2] Williams contrasted this with R.D.'s previous success when she was attending school,

---

[1] Williams explained that in virtual school, the students have to work four hours per day, 20 hours per week. R.D. was 2.8 days behind in her homework.

[2] Counsel for both Parents and Children clarified that the school district did not require R.D., who is 16, to be supervised at home to complete her work.

participating in extra-curricular activities and receiving services. Williams also reiterated her concern with T.D. having unsupervised contact with R.D. and A.D., especially since Mother seemed to minimize the seriousness of T.D.'s past conduct with R.D.

CYS also presented Maria Andrews (Andrews), a counselor with Youth Services Bureau, a service provider of CYS. When she visited the home less than a week earlier on October 3, 2019, there was a strong smell of cat urine and dog feces in the house along with garbage, dirty dishes and rotten food. When she went into the basement, she saw several piles of dog feces left by the family's newly-adopted dog. When she returned for another visit, the smell of dog feces was still in the house.

Williams and Andrews recommended that Children be placed with their maternal uncle in Mercer County. Mother opposed removal and refuted the concerns expressed by CYS, including denying that T.D. was residing at the home. Despite these refutations, the trial court adjudicated Children dependent and, over the objection of Parents and the GAL, placed them in kinship placement. Under the trial court's order, the next hearing on the Children would be held on March 24, 2020. On November 7, 2019, Parents filed a notice of appeal along with a statement of matters complained of on appeal under Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court issued its

Pa.R.A.P. 1925(a) opinion on December 5, 2019. Parents now challenge the trial court's dependency and placement determinations.[3]

## II.

Parents claim that the trial court committed an abuse of discretion in adjudicating Children dependent because there was not clear and convincing evidence that Children were lacking proper care and control. Parents divide their claim into six separate arguments that we address individually. Before addressing these arguments, we review our guiding principles.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citation omitted).

> [T]he scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because [the court] is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before [the court]. Relying upon [the court's] unique posture, we will not overrule [its] findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa. Super. 2000) (quotation omitted).

Section 6302 of the Juvenile Act defines a "dependent child," in relevant part, as one who:

---

[3] The GAL for Children did not appeal from the trial court's orders and has not submitted a brief in this appeal.

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302.

A court may adjudicate a child as dependent if the child meets the statutory definition by clear and convincing evidence. *See In re E.B.*, 898 A.2d 1108, 1112 (Pa. Super. 2006). That is, the evidence must be "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of C.R.S.*, 696 A.2d 840, 845 (Pa. Super. 1997). "[T]he dependency of a child is not determined 'as to' a particular person, but rather must be based upon two findings by the trial court: whether the child is currently lacking proper care and control, and whether such care and control is immediately available." *In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010) (citations omitted).

### A.

Parents first argue that the trial court relied on its previous dependency adjudications of T.D. and D.D. in finding Children dependent. Parents, however, did not raise this issue in their Pa.R.A.P. 1925(b) statement of errors complained of on appeal. By failing to do so, Parents have waived the issue.

*See* Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b)s]tatement ... are waived").

Even if preserved, we would find that this claim lacks merit. In its findings of fact, the trial court included the family's history with CYS, including the dependency and placement of T.D. and D.D., in order to give a complete background and explain its concerns for Children and what they have experienced in the home through the years. The trial court's dependency determination for Children was limited to the evidence about them after the termination of supervision in January 2019. Consideration of the brothers' history, particularly in regards to T.D. and R.D., was proper to the extent it explained the mental health concerns of Children. Accordingly, the trial court did not improperly rely on its prior dependency determinations.

**B.**

Next, Parents argue that the trial court lacked a sufficient factual basis to conclude Children, particularly R.D., declined after the termination of court supervision in January 2019. To the contrary, the trial court provided ample factual basis for this finding in its Pa.R.A.P. 1925 opinion:

> [CYS's] evidence at the October 9, 2019 hearing included testimony detailing the history of the family's involvement with service providers since dependency was terminated for the girls. This included the fact that, one day after dependency was terminated, R.D. missed a counseling appointment with her trauma therapist, and she missed two days of school the next week. Counseling had been established for both girls due to the trauma associated with the violence in the home and overall conditions, their brothers' removal from the home, and social service agencies being in and out of their lives for such a long

- 9 -

period of time. For R.D., the counseling was also critical in terms of addressing trauma associated with the sexual assault involving TD. The concerns over missed school and counseling were timely addressed with the family.

By March of 2019, R.D. exhibited signs of significant depression. Her hygiene regressed to a point where she would not shower, wash, or change her clothes, and she began regularly missing appointments and locking herself in her bedroom and refusing to come out. Home conditions fluctuated between minimally acceptable and deplorable, as detailed by the testimony regarding food debris and garbage laying around the house, animal feces and a urine odor through-out the home, and, on one occasion, dried-up vomit throughout the bathroom. This issue is addressed further below.

By the end of the 2018/2019 school year, R.D. was missing a lot of school, and A.D. had been tardy or late nine days. Truancy and tardiness continue to be a significant problem in the 2019/2020 academic year. Parents have not been successful in ensuring that either of the girls attends school consistently and in accordance with the school schedule. Evidence at the October 9, 2019 hearing established that R.D. had been to school only a handful of days from the time school started on August 26, 2019 until September 27, 2019. This information did not come from Parents initially. In fact, in response to inquiries by the family's reunification worker about how things were going, Mother responded that everything was going fine. The reunification worker later received reports that R.D. had missed approximately two weeks of school. There were initial reports that R.D. might be ill with a contagious disease, and Mother reported having taken her to the emergency room in early September. Parents report that R.D. is not able to attend public school because of high anxiety associated with leaving the home. This is also corroborated to some degree by reports from a school counselor that R.D. would arrive at school and refuse to get out of the car, requiring school staff to help remove her and bring her into the school. She ultimately refused to go to school altogether. R.D. was often left home alone during this time, despite what appear to be significant issues with depression, a history of self-harm and suicidal ideation, and possibly a physical illness for which she was taken to the emergency room. [CYS] workers were not able to make contact with the family during much of this time despite repeated attempts.

- 10 -

By the time of the October 9 hearing, R.D. had been enrolled in State College Area High School's Virtual school. She had been enrolled in the virtual school program on September 27, 2019, which was the day originally scheduled for the dependency adjudication in this case but then continued at Parents' request. (See Order dated September 27, 2019). As of the October 9 hearing, R.D. was already 2.8 days behind in her virtual school work. The Agency was advised by the school that action would be taken before the magisterial district court regarding R.D.'s truancy.

In September of 2019, [CYS] learned that both R.D. and A.D. had stopped seeing their counselor, Pam McCloskey, in August. This information was not originally provided by Parents. Rather, it was first brought to the attention of the reunification counselor working with the family in September of 2019 when she went to A.D.'s school to see her because she had received reports of R.D.'s truancy and was unable to make contact with the family for approximately two weeks despite multiple visit attempts at the home.

CYS testimony established that part of the concern regarding R.D.'s truancy is for her overall emotional and mental wellbeing. Over the course of the years working with the family, [CYS] and service providers have observed R.D. to enjoy school and extracurricular activities, and to thrive in that environment. Significant concern exists with respect to R.D.'s lack of exposure to peers, outside activities, and the environment outside the home in general. These circumstances are exacerbated by the facts that R.D. is not seeing an individual counselor and that she has a past history of self-harming behavior and aggression toward family members at times.

[CYS] testimony established that A.D. was observed to be emotionally volatile at times, and that Mother's manner of comforting her in those situations was excessive and inappropriate physical contact that undermined the work and efforts of the reunification team, including the family, to establish personal boundaries essential to the wellbeing of the family and its individual members, including A.D. A.D. was observed to be invasive of others' physical space and to flaunt herself around other family members. A.D. was also observed to refuse any food offered in the family home; this had been a problem for D.D. and T.D. in the past as well.

- 11 -

Evidence also demonstrated concerns about the possibility that T.D. may be having unsupervised contact with R.D. and A.D. This was largely based on [CYS] seeing T.D.'s suitcase and duffle bag filled with clothes in his bedroom on one or two occasions, and the fact that [CYS] knew T.D. had returned to the area but did not know his whereabouts or living arrangements. The evidence established that Parents had not been forthcoming or cooperative with [CYS] about information relating to T.D.'s whereabouts and contact with the family.

In sum, the evidence presented by [CYS] at the October 9, 2019 hearing demonstrated that the girls were, once again, having excessive absences from school and/or tardy days, that both were exhibiting behaviors indicative of emotional instability, that their counseling had been significantly interrupted, (and had been effectively terminated for R.D.), that home conditions had worsened to the point of being completely unsanitary, that significant concerns existed with respect to whether the girls were being appropriately cared for and supervised, and that Parents were not being forthcoming or cooperative with [CYS] and service providers.

Trial Court Opinion (T.C.O.), 12/5/19, at 5-8.

Here, the trial court reviewed the record and credited CYS's testimony in concluding that Children declined after January 2019. The trial court, sitting as the finder of fact, is in the best position to make that factual determination, and we are bound to accept that determination so long as it is supported in the record, which, as thoroughly summarized by the trial court, it is.

**C.**

In their next argument, Parents claim that the trial court erred to the extent it determined Children were dependent based on missing or being late for school. Parents emphasize that there was no evidence Children were

failing any classes. As for R.D., Parents note, Mother cooperated with the school district in enrolling her in virtual school due to her extended absences.

Parents' argument, however, really amounts to a disagreement with the trial court's concern about the educational needs of Children. The trial court's finding that Parents were not providing the necessary support of those needs is supported by the record. As noted above, after January 2019, R.D. began again to miss school and A.D. was continually tardy because Parents would not get her to school on time. Additionally, R.D. was almost entirely absent for the first month of school from August to September 2019. When she enrolled in virtual school at the end of September 2019, she fell behind nearly three days into her assignments within just the first week.[4] This is sufficient to support the court's finding that the educational needs of Children were not being met, which was just of several concerns that the trial court relied on in adjudicating them dependent.

**D.**

Parents next claim that there was an insufficient factual basis for the trial court to conclude that conditions in the home had deteriorated. Parents

---

[4] Parents dispute that R.D. was 2.8 days behind in her work, as Mother testified that it was assignments and not hours. *See* N.T., 10/9/19, at 102. In contrast, Williams testified that she spoke to R.D.'s counselor in charge of the virtual school; she explained that R.D. was 2.8 days behind and a day equaled four hours of work. *See id*. at 38. On this dispute, the trial court credited Williams' testimony and we are bound to accept its finding.

fault the trial court for crediting Andrews' testimony over Mother and argue that the unsanitary conditions in the home, including dog feces and black smears, could have been easily remedied.

To the extent Parents argue the trial court erred in crediting the testimony of Andrews over Mother, which they argue the trial court did out of "bias and preference," we disagree. We are required to accept the trial court's credibility determinations that are supported by the record. *See In re L.Z.*, 111 A.3d 1164, 1174 (Pa. Super. 2015) (citation omitted).[5] Andrews testified that the home was in poor condition even after the dependency petitions were filed, which included her home visit on October 3, 2019. *See* N.T., 10/9/19, at 69-70. There was a smell of dog feces, cat urine, garbage and rotten food. *Id*. at 70. In the kitchen, there was a ham bone left out covered in flies. *Id*. Meanwhile, in the basement, there was dog feces that was picked up but not scrubbed, and throughout the house there were black smears. *Id*. at 71-72. As the trial court noted, the conditions of the home have been a source of continuing concern through the years, with the conditions sometimes improving through help with service providers and then deteriorating when there has been a lack of supervision. *See* T.C.O. at 9-10. We find no error

_____

[5] Parents attempt to attack the trial court's crediting of Andrews that there was a ham bone wedged in R.D.'s bed between the mattress and the frame. *See* N.T., 10/9/19, at 70. Mother refuted this by claiming it was a dog toy. *Id*. at 91. Again, the trial court is in the best position to make this factual determination and simply credited Andrews' testimony over Mother's.

in the trial court crediting Andrews' testimony and finding that the conditions of the home had again regressed and created an unsafe environment for Children.

**E.**

Parents also argue that the trial court placed undue emphasis on T.D.'s decision to not remain in the care of CYS when he turned 18 years of age in July 2019. Parents acknowledge the trial court disavowed that it was relying on this fact in its dependency adjudication for Children, but emphasize that CYS expressed their concern at the hearing about T.D. choosing to leave the care of CYS. However, as Parents concede, the trial court expressly stated that it did not find T.D.'s decision to be particularly relevant to its dependency determination. ***See id***. at 10. To the extent that it did, it did so only in reference to R.D. and its concern with T.D. having unsupervised contact with her because of past abuse.[6] We find no error.

**F.**

Finally, in their last argument challenging dependency, Parents claim the trial court again placed undue emphasis on Children being withdrawn from

---

[6] We also note that Parents leaving Children unsupervised with T.D. could meet the definition of "child abuse" for "intentionally, knowingly, or recklessly ... [c]reating a likelihood of sexual abuse or exploitation of a child through any recent act or failure to act." 23 Pa.C.S. § 6303(b.1)(6).

counseling with their original psychiatrist and seeking a new therapist for both.

On this issue, the trial court explained its finding:

> The Court did not find the fact of a change, in and of itself, to be of critical concern; however, there was a substantial interruption in much-needed therapy for the girls as a result, and a lack of communication by Parents with [CYS] and service providers on this important issue. This is particularly problematic with respect to R.D., who was exhibiting substantial emotion and mental health difficulties during this time. Testimony established that R.D. was working with Mother and Mother's therapist to some degree, but had not engaged in her own, individual counseling. The Court was not persuaded by Mother's testimony suggesting that R.D. refused to see the former therapist and that she was doing all she could to have R.D. establish a new therapist.

T.C.O. at 10-11.

As the trial court observes, Parents have the right to determine which therapist the Children will see. However, by doing so, Parents' decision resulted in R.D., who the trial court found had been declining since the beginning of 2019, to be left without any individual counseling and no prospects of obtaining a new psychiatrist anytime soon. Coupled with the Parents' failure to inform CYS of the sudden change, we discern no abuse of discretion in the trial court concluding that Parents were not doing enough to ensure the mental health of Children, and that along with all of the above-discussed concerns, determined that Children lacked proper parental control. Accordingly, because there is clear and convincing evidence meeting the standard set at 42 Pa.C.S. § 6302 for finding the Children dependent, the trial court did not abuse its discretion in so holding.

## III.

Parents also argue that the trial court erred in placing Children with their maternal uncle rather than allowing them to remain in the home. Regarding whether a child should be removed from parental control:

> The law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being. In addition, this court had held that clear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.

*In re A.B.*, 63 A.3d 345, 349-350 (Pa. Super. 2013) (citation omitted). "Ultimately, a hearing court is given broad discretion in meeting the goal of entering a disposition 'best suited to the protection and physical, mental, and moral welfare of the child.'" *In re S.M.*, 614 A.2d 312, 315 (Pa. Super. 1992) (citation omitted).

Like their dependency argument, Parents' claim against placement really amounts to a disagreement with the trial court. In their two-paragraph argument, Parents cite no case law demonstrating that the trial court erred in determining that kinship placement was the least restrictive placement that meets the needs of Children. While it is true, as Parents point out, that there had previously been improvement in R.D. and A.D., the trial court had ample record support for concluding that the needs of the Children were not being met at the time of the October 2019 dependency hearing. Besides the ongoing concerns pertaining to their educational and mental health needs, there was

evidence that the sanitary conditions of the home had worsened merely days before the hearing. As we found concerning dependency, the trial court is in the best position to determine the disposition best suited to the physical, mental, and moral welfare of Children. Because Parents have failed to demonstrate that the trial court erred in that decision, we find that this claim merits no relief.[7]

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 04/03/2020

---

[7] We further note that Parents have waived this claim by failing to raise it in their Pa.R.A.P. 1925 statement.