J-S02032-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1773 EDA 2023 |

Appeal from the Order Entered July 27, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000717-2021

BEFORE:   LAZARUS, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:            **FILED MARCH 13, 2024**

S.M. (hereinafter "Mother") appeals from the order entered in the Court of Common Pleas of Philadelphia County Juvenile Division adjudicating her minor children dependent and finding she was a perpetrator of child abuse pursuant to Section 6303(b.1)(1) of the Child Protective Services Law ("CPSL").[1]  On appeal, Mother argues that the Philadelphia Department of Human Services ("DHS") did not present clear and convincing evidence that she committed child abuse against her 13-year-old daughter, T.F.  We affirm.

The trial court sets forth the relevant facts and procedural history, as follows:

---

[*] Former Justice specially assigned to the Superior Court.

[1] 23 Pa.C.S.A. §§ 6301-6387.

S.M. is the mother of child, T.F., and D.B. was Mother's paramour.[2] T.F. is currently 13 years of age. T.F. resided in the family home with [Mother] and D.B., and her younger sister. [DHS] became involved with the family in May of 2021 when it received allegations of domestic violence between D.B. and [Mother] as well as allegations concerning excessive and problematic alcohol consumption by [Mother]. On July 13, 2021, DHS received a Child Protective Services ("CPS") report alleging that T.F. had been sexually abused by D.B. and had been physically abused by [Mother]. This report was indicated. (N.T. June 29, 2023, Pages 8 to 11).

Zoharmella Savoy is employed by DHS and assigned to the MDT Unit.[3] Her duties include investigating reports of child abuse. She testified that she visited the family home shortly after receiving the CPS report that initiated the child abuse investigation. She arrived at the residence and knocked on the door which was answered by [Mother]. D.B. was also present on the first floor and was dressed in his underwear [(later described as boxer shorts. D.B. put on pants before Investigator Savoy entered the home)]. T.F. and her sister were upstairs. After [D.B.] got dressed, Ms. Savoy provided D.B. verbal and written notification of the report and a review of his rights. D.B. responded by telling Ms. Savoy that he was already "cleared of

---

[2] The record contains numerous references to D.B. as T.F.'s stepfather. Notably DHS Investigator Zoharmella Savoy testified that the initial CPS report filed in this matter referred to D.B. as Mother's paramour, but she corrected the record to indicate that "[i]t was learned later that he was the stepfather [at the times in question]." N.T., 6/29/23, at 11. **See also** N.T. at 106. CUA-9 Case Manager Nasir Ismail testified that he assumed a female voice he heard in the background during a phone conversation with D.B. belonged to Mother, "because at the time they allegedly were married." D.B. identified himself to the trial court as "Stepfather" at the outset of the dependency hearing, **see** N.T., 6/29/23, at 11, and both Mother's counsel and DHS counsel referred to D.B. as "Stepfather." **See** N.T., 7/7/23, at 5-6, 30. Finally, we note that counsel for D.B. in his related appeal refers to D.B. as the children's "Guardian."

[3] Investigator Savoy explained that the MDT unit handles ongoing cases that have had valid reports of fatalities, near fatalities, and sex abuse in the past. The case is "either open with the CUA or just has—had some recent activity." N.T., 6/29/23, at 6-7.

that." It later became clear to Ms. Savoy that D.B. was speaking about prior allegations of sexual abuse that occurred in Delaware County and for which he was not prosecuted.[] During this discussion, D.B. and [Mother] brought out a binder containing documents related to a prior CPS report alleging sexual abuse by D.B. D.B. repeatedly told Ms. Savoy that he was never charged. [N.T. at 25].

Ms. Savoy also provided [Mother] verbal and written notifications as well as a review of her rights. [Mother] told her that she did not believe the allegations against D.B. were true. [N.T. at 52-53]. She admitted that she subjected T.F. to physical discipline and that the discipline consisted of striking her with an open and closed hand. She denied harming or abusing the children. N.T. 6/29/23, at 19-24.

D.B. told Ms. Savoy that Mother hits the children, especially T.F., and that he sometimes gets in the middle of it. He mentioned that Mother struck T.F. in the nose and that her nose was bloodied on one occasion. He also stated that when Mother drinks she becomes violent and strikes him as well. N.T. at 26, 27.

Ms. Savoy spoke with T.F. at the residence and during a walk around the neighborhood. She testified that they walked around the block because she wanted T.F. to feel safe while talking to her. Prior to speaking with Ms. Savoy, T.F. stated, "If I talk to you, you can't leave me here because that's what happened before. I said something and I was stuck here." Ms. Savoy testified that T.F. implied that her home situation worsened the last time she spoke out. N.T. at 28.

T.F. told Ms. Savoy about physical abuse inflicted upon her by Mother but did not initially disclose the sexual abuse by D.B. However, T.F. did state that the physical abuse caused by Mother is often spurred by Mother accusing T.F. of having sexual contact with D.B. She told Ms. Savoy that Mother often accuses her of "doing something" with D.B. and sometimes sniffs her vaginal area to assess whether she has been sexual with D.B. N.T. at 42.

Ms. Savoy decided to acquire an Order of Protective Custody ("OPC") for T.F. and her sister based upon the allegations of physical and sexual abuse as well as the fear expressed by T.F. during their conversation. N.T. at 28-31. T.F. stressed to Ms. Savoy that she never allows her younger sister to be alone with

D.B. and that if T.F. is relocated out of the home that under no circumstances can her sister be left there without her. N.T. at 45, 46.

Later on, during July of 2021, it was brought to Ms. Savoy's attention that T.F. wished to speak to her again. T.F. informed Ms. Savoy that she was "ready to talk" and wanted to tell Ms. Savoy everything about the situation concerning Mother and D.B.

T.F. detailed several months of sexual abuse by D.B. the abuse included being shown pornography, being subjected to oral and digital penetration, and giving and receiving oral sex. She told Ms. Savoy that she never liked any of the sexual acts and that the abuse was progressing. She stated that at first D.B. placed her hand on his genital area and told her how to touch him and what to do. She described being told to perform oral sex on him and his digitally penetrating her. T.F. told Ms. Savoy that she was scared she was going to be raped. T.F. also spoke of being physically assaulted by Mother on almost a daily basis and described a recent assault during which she thought her nose might have been broken. She also described Mother as drinking alcohol every day. This claim was corroborated by D.B. N.T. at 58-61.

Mr. Ismail testified that he is a social worker who was assigned this case. He testified that there were two telephone calls made to his agency's hotline regarding this case on October 15, 2021, and October 18, 2021. A person who identified himself as Latia Badu claimed that he had gone through his daughter's cell phone and saw months of texts between T.F. and his daughter. The caller stated that he saw a text sent by his daughter to T.F. and that the text read, "if you lie on your family, you can live with us." In the second telephone call to the hotline, the caller stated, "I'm from Africa" and that T.F. "called [his] daughter and is making up lies." Both calls to the hotline originated from the telephone number that the agency had on file for D.B. N.T. at 130, 131. This led Mr. Ismail and this court to conclude that D.B. telephoned his agency, claimed to be someone else, and alleged that T.F.'s allegations were fabricated to convince the agency that he did nothing wrong. [N.T. at 137-140]

Mother testified that she used corporal punishment while raising her children. She denied causing them injuries that required medical attention. She claimed that she did not know D.B. was

- 4 -

sexually assaulting T.F. and stated that she had no reason to suspect that he was a sexual abuser. She also told the court that she placed herself in alcohol treatment but attempted to minimize her drinking by saying that her alcohol use was an accusation that was not proven and that her daughters' claims about her problematic alcohol use were lies. N.T. at 152-164.

T.F. testified about the nature and extent of the physical and sexual abuse she suffered. She stated that she was sexually abused by D.B. on multiple occasions and described that abuse as including his touching her vagina after removing her pants. She described touching her vagina, mouth, and buttocks with his penis. She told the court that D.B. placed his penis inside her mouth and up against, but not inside, her vagina and buttocks. She described being forced to do these things by D.B. and noted that the nature of the force was sometimes his words and other times by physically pulling her toward him. N.T., 2/16/23, 9-18.

She testified that she did not believe that Mother was aware of this but also testified that Mother referred to D.B. as a pedophile. T.F. also testified that Mother beat her multiple times. She stated that Mother frequently beat her with her hands and hit her in the face, head, and stomach. She described an instance where she was beaten and she fell to the ground and Mother stood over top of her and choked her by squeezing her neck with her hands. She also mentioned that her mother smelled her vaginal area to check whether D.B. had done anything sexual to her. N.T. at 44-61.

Trial Court Opinion, 9/15/23, at 2-6.

On July 7, 2023, the trial court entered its order indicating that it found clear and convincing evidence that Mother and D.B. perpetrated child abuse against T.F. Regarding Mother specifically, the trial court found that she had abused T.F. through both affirmative acts of physical violence and acts of omission where she did nothing while she either knew or should have known, particularly based on her knowledge of past accusations and her active suspicions of ongoing sexual contact between D.B. and T.F., that D.B. was sexually abusing T.F. In this regard, the trial court opined:

This court also finds that [Mother] knew, or suspected, that D.B. was sexually abusing her daughter and took no action to stop or report it. [Mother] allowed D.B. to continue residing in the family home with T.F. despite the awareness she demonstrated by calling him a "pedophile" and inspecting T.F.'s body for evidence of sexual abuse. [Mother] also physically abused T.F. during this time period by striking, choking, and hitting her. [Mother] and D.B. continue to deny that the allegations made by T.F. have merit. [Mother] and D.B's actions and inactions constituted instances of child abuse pursuant to 23 Pa.C.S.A. §§ 6303(b.1).

Trial Court Opinion, at 9.

Mother filed a timely appeal on July 7, 2023, and through newly appointed counsel filed her Brief for Appellant. In her Brief for Appellant, Mother presents the following question for this Court's consideration:

Did the trial court err in granting the Petition of DHS, for a finding of child abuse, as to Mother either directly or indirectly and/or by neglect that caused injuries to the child, as required by 42 Pa.C.S.A. § 6303(b)(1)?

Brief of Appellant, at 6.

Mother challenges the sufficiency of evidence offered to prove both that she directly caused serious bodily injury to T.F. while "disciplining" her and that she knew of, or negligently disregarded, D.B.'s ongoing sexual abuse of T.F. in the family home. As to the proffer of her direct physical abuse of T.F., Mother argues that testimony and evidence confirmed by all parties was limited to one incident where she split T.F.'s lip and caused it to bleed while disciplining the child. Even that injury, she argues, may have occurred when T.F. slipped during the incident.

With respect to her role in D.B.'s sexual abuse of T.F., Mother points to evidence that T.F. admitted never telling her of the abuse and confirmed it

occurred when Mother was not at home. Moreover, She denied T.F.'s allegations that she frequently accused T.F. of having sex with D.B. and subjected her to strip-search smell tests—particularly of T.F.'s genital area—checking for D.B.'s scent.

The Pennsylvania Supreme Court has set forth our standard of review for dependency cases as follows:

> The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. We review for abuse of discretion[.]

*In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (quotation marks and quotation omitted).

Where, as in the case *sub judice*, the trial court deems parents perpetrators of child abuse under the CPSL, we note that "[although] dependency proceedings are governed by the Juvenile Act[4]...the CPSL controls determinations regarding findings of child abuse, which the [trial] courts must find by clear and convincing evidence."[5] *In the Interest of L.V.*, 209 A.3d 399, 417 (Pa. Super. 2019) (citations and footnotes omitted)

---

[4] Pennsylvania Juvenile Act ("Juvenile Act"), 42 Pa.C.S.A. §§ 6301-6375.

[5] "Clear and convincing evidence" is defined as evidence that is "so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In the Interest of C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quotation marks and quotation omitted).

(footnote added). "[T]he [Juvenile] Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Juvenile Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." *In the Interest of J.R.W.*, 631 A.2d 1019, 1023 (Pa. Super. 1993).

As part of [a] dependency adjudication, a court may find a parent...to be the perpetrator of child abuse[ ] as defined by the...CPSL." *In the Interest of S.L.*, 202 A.3d 723, 728 (Pa. Super. 2019) (quotation marks and quotations omitted). Under the CPSL, "child abuse" is defined as "intentionally, knowingly, or recklessly doing" one of many acts, including causing bodily injury[6] to a child through any recent act or failure to act. *See* 23 Pa.C.S.A. § 6303(b.1) (defining "child abuse").[7]

---

[6] The CPSL defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(b.1) (defining "bodily injury").

[7] The CPSL directs to 18 Pa.C.S.A. § 302(b) to define "intentionally", "knowingly", and "recklessly", as follows:

> (1) A person acts intentionally with respect to a material element of an offense when:
>
>> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
>> (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.
>
> (2) A person acts knowingly with respect to a material element of an offense when:

*(Footnote Continued Next Page)*

Nevertheless, we have observed that Section 6381(d) provides for an "attenuated" standard of evidence in making a legal determination as to the abuser in child abuse cases when the serious injury suffered would not ordinarily occur except by acts or omissions of the parent or other person responsible for the child's welfare.  Specifically, in **Interest of C.B.**, 264 A.3d 761, 773 (Pa. Super. 2021) (*en banc*) this Court sitting *en banc* held that a trial court's culpability determination as to whether the child abuse was intentional, knowing, or reckless is "superfluous":

> Under Section 6381 of the CPSL, a petitioning party is not required to establish that the parent or caregiver perpetrated the abuse "intentionally, knowingly, or recklessly."  Rather, in Section 6381 cases, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible," permitting

> > (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

> > (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

> (3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b).

petitioners to "prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action [or inaction] of the parents or responsible person and the implausible statements of the parents and responsible persons."

*Id.* (quotation and citations omitted).  *See* 23 Pa.C.S.A. § 6381(d).

Our *en banc* Court observed, further, how in *Interest of J.R.W.* this Court recognized:

> **This lessened standard of establishing abuse by the caretakers [under Section 6381(d)], coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the [trial court] must apply in deciding abuse cases**. *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case. There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse. **The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required**. We find no defect in this reasoning.  Such a standard provides maximum protection for the child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children. It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom.  Thus[,] the [L]egislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.

*Interest of J.R.W.*, 631 A.2d at 1024.

*Interest of C.B.*, 264 A.3d at 771-72 (emphasis in original).

Under Section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by...[DHS]...and the rebuttal of the parent or responsible person.

*Interest of C.B.*, 264 A.3d at 772 (quoting *In re L.Z.*, 111 A.3d at 1185) (acknowledging, further, that a parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to that parent). *Id.* at 1185-86.

Here, Mother contends there was no evidence that she caused serious physical injuries to her child, T.F., nor was there any evidence that she failed to protect her child. She cites generally that her home was evaluated and deemed appropriate, and that she was cooperative and forthcoming in acknowledging she disciplined her children. The only evidence that she physically disciplined T.F. consisted of T.F.'s testimony that Mother hit her in the nose and caused her nose and lip to bleed. Mother maintains the event caused no serious physical injury, required no trip to the emergency room, and did not prompt any mandatory reporter, such as a teacher at T.F.'s school, to file a report of apparent physical abuse. Brief of Appellant, at 15.

- 11 -

The "Brief for Child" submitted by T.F.'s attorney and Guardian *ad Litem*, argues the record clearly supports the trial court's finding that Mother physically abused T.F. by striking her in the face with a closed and open hand, causing T.F. to sustain a bloodied nose and mouth. N.T., 2/16/23, at 21; N.T., 6/29/23, at 26-27. Asked to rate on a scale of 0 to 10 the level of pain she experienced from the blow, T.F. replied, "10 out of 10" and that the pain lasted "a little while." N.T., 2/16/23, at 32. T.F. testified that she hurt so much that she believed her nose was broken, but she was told to go to her room and never received medical attention for her injury. N.T. at 60.

The Guardian *ad Litem* disputes Mother's position on whether evidence established that she knew or had reason to know that T.F.'s stepfather, D.B. was sexually abusing her during unsupervised times in the family household. She recounts testimony that Mother called D.B. a "pedophile", which reflected Mother's distrust of D.B., and on several occasions conducted highly invasive bodily examinations of T.F looking for indications that D.B. had sexual contact with her 13-year-old daughter. N.T., 2/16/23, at 16-17; N.T., 6/29/23, at 28-29, 46, 61. T.F. also testified that, during the examinations, Mother would insult her and accuse her of voluntarily having sex with D.B. N.T., 2/16/23, at 45-46.

For its part, the juvenile court has authored an opinion setting forth a comprehensive review of pertinent testimony offered by T.F., DHS investigator Zoharmella Savoy, Social Worker Samir Ismail, Mother, and T.F., and setting

forth its credibility determination in favor of T.F. and against Mother. Specifically, the trial court opines:

> This court finds that T.F.'s statements made to the DHS investigator, CUA, and during her testimony were credible. Despite her failure to initially disclose the sexual abuse inflicted upon her by D.B., T.F. was consistent and unwavering in the allegations she made against him. She was also consistent in credibly describing the physical abuse she suffered at the hands of [Mother]. The fact that [Mother] referred to D.B. as a "pedophile" and routinely inspected and sniffed T.F.'s vaginal area to assess whether D.B. had sexual contact with her clearly demonstrates that S.M. at best suspected, and at worst was aware, that D.B. was sexually assaulting her daughter in the family home. The failure to act and respond appropriately by both parents caused S.P. serious physical and mental injuries.
>
> This court was not persuaded by [Mother's] testimony and found the assertions she made under oath to be incredible. [Mother] admitted to subjecting her children, including T.F., to corporal punishment but denied inflict[ing] physical abuse as described by T.F. She also denied smelling T.F.'s genital area as described by T.F.'s claim that she referred to him as a "pedophile." [Mother] also minimized her issues involving alcohol despite D.B. acknowledging she had a problem. [Mother's] testimony was in direct conflict with the testimony of T.F. and all others who testified. This court noted that S.M.'s testimony was self-serving and lacked the ring of truth. The statements and testimony offered by T.F., Ms. Savoy, and Mr. Ismail were truthful and those made by [Mother] were incredible, unpersuasive, and additional evidence of the continued harm that she and D.B. have inflicted on T.F.
>
> This court finds child abuse by clear and convincing evidence. The court finds that D.B. was the perpetrator of multiple instances of sexual abuse against T.F. The court also finds [Mother] knew, or suspected, that D.B. was sexually abusing her daughter and took no action to stop or report it. [Mother] allowed D.B. to continue residing in the family home with T.F. despite the awareness she demonstrated by calling him a "pedophile" and inspecting T.F.'s body for evidence of sexual abuse. [Mother] also physically abused T.F. during this time period by striking, choking, and

- 13 -

hitting her. [Mother] and D.B. continue to deny that the allegations made by T.F. have merit. [Mother] and D.B.'s actions and inactions constituted instances of child abuse pursuant to 23 Pa.C.S.A. §§ 6303(b.1).

Juvenile Court Opinion, 9/15/23, at 8-9.

Careful review of the record reveals no abuse of discretion with either the trial court's findings of fact and credibility determinations, as they are supported by the record, or its conclusions of law that Mother abused her 13-year-old daughter, T.F., through both the physically abusive action of punching T.F. directly in the nose causing T.F. to suffer intense pain and a bloody nose and the failure to intervene on her daughter's behalf under circumstances where she knew or, at the very least, should have known that Stepfather D.B. was sexually abusing T.F. in the family home. It is within the purview of the trial court, which sits as the trier-of-fact in these types of cases, to determine whether there is clear and convincing evidence of child abuse.

Regarding the allegations of Mother's physical abuse of T.F., a finding of child abuse, as discussed *supra*, requires only bodily injury, which is impairment of physical condition or substantial pain. 23 Pa.C.S.A. § 6303(a) and (b.1)(1). T.F.'s testimony, accepted as true by the trial court, provided clear and convincing evidence that Mother knowingly, intentionally, and recklessly caused physical injury to T.F. from a direct punch to the face that bloodied T.F.'s nose and caused her to experience extreme pain, which, she testified emphatically, rated a most-painful "10" on a scale of 1 to 10.[8]

---

[8] Indeed, Mother admitted that she frequently "popped" T.F. but never "beat her up." N.T. at 153.

Substantial pain may be inferred from the circumstances surrounding the physical force used. ***Commonwealth v. Duck***, 171 A.3d 830, 836 (Pa. Super. 2017) (bodily injury for purposes of simple assault established where victim, who was pushed into a door frame, suffered head laceration that bled "a lot", formed a scab, and caused pain described by victim as a "five, six" on scale of one to ten). ***See also Commonwealth v. Jorgenson***, 492 A.2d 2, 6 (Pa. Super. 1985) (a finder of fact may infer that striking a victim across the face causes substantial pain supporting a finding of bodily injury necessary to a simple assault charge).

The alternate basis on which the trial court made its finding of child abuse against Mother stemmed from evidence that Mother failed to intervene when surrounding circumstances were such that she either knew or should have known D.B. was sexually abusing T.F. Mother's argument assailing this basis consists of the following: "There was no evidence that Mother knew that her child was being sexually abused . . . . When child was taken to CHOP after her first PCA interview, there were no injuries and nothing to prove or disprove sex abuse." Brief of Appellant, at 15.

Testimony at trial established that Mother strongly suspected D.B. of sexual abusing T.F. in the household but did nothing to prevent it. Instead, she scolded and humiliated T.F. for being alone with "pedophile" D.B., accused her of having sexual relations with him, and on several occasions inspected her body, including her vaginal area, for D.B.'s scent. N.T., 2/16/23, at 16-17, 45-46. N.T., 6/29/23, at 27. In Ms. Savoy's presence, moreover, Mother

demonstrated both a knowledge of past accusations of child sex abuse against D.B. and revealed, albeit somewhat unintentionally, that she had concerns about leaving D.B. alone with T.F.  N.T. at 25.

We conclude there is ample evidence in the record to support the trial court's determination.  It is well settled:

> [a] finding of abuse may support an adjudication of dependency. When the court's adjudication of dependency is premised upon physical abuse, its finding of abuse must be supported by clear and convincing evidence.  However, its findings as to the identity of the abusers need only be established by *prima facie* evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers (parents).  **In re C.R.S.**, 696 A.2d 840, 843 (Pa. Super. 1997) (internal quotations and citations omitted).  Furthermore, "when determining whether a parent is providing a minor with proper care and control, we believe that the caretaker's acts and omissions should weigh equally." **In the Interest of JOV**, 686 A.2d 421, 423 (Pa. Super. 1996).  "The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict." **Id**.

**In re A.H.**, 763 A.2d 873, 876 (Pa. Super. 2000).

Under the record before us, we find no merit to Mother's argument denying that evidence established she failed to protect her child.  The trial court found credible both T.F.'s testimony that Mother frequently accused her of having sex with D.B. and Ms. Savoy's testimony that Mother knew of D.B.'s past and expressed her concerns about him in the household with the girls. Accordingly, we discern no error with the trial court's finding of child abuse against Mother on the alternate basis that she failed to fulfill her parental duty

under the facts to intervene in the face of compelling evidence that D.B. was sexually abusing T.F.

For the foregoing reasons, we affirm.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/13/2024